# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

VANGUARD INTERNATIONAL EQUITY
INDEX FUNDS, ON BEHALF OF ITS
VANGUARD EMERGING MARKETS STOCK
INDEX FUND SERIES, VANGUARD FTSE
ALL-WORLD EX-US INDEX FUND SERIES,
AND VANGUARD TOTAL WORLD STOCK
INDEX FUND SERIES; VANGUARD
SPECIALIZED FUNDS, ON BEHALF OF ITS
VANGUARD ENERGY FUND SERIES;
VANGUARD STAR FUNDS, ON BEHALF OF
ITS VANGUARD TOTAL INTERNATIONAL
STOCK INDEX FUND SERIES; VANGUARD
TRUSTEES' EQUITY FUND, ON BEHALF OF
ITS VANGUARD INTERNATIONAL VALUE
FUND SERIES AND VANGUARD EMERGING
MARKETS SELECT STOCK FUND SERIES;
VANGUARD CHESTER FUNDS, ON BEHALF
OF ITS VANGUARD PRIMECAP FUND
SERIES; VANGUARD FENWAY FUNDS, ON
BEHALF OF ITS VANGUARD PRIMECAP
CORE FUND SERIES; VANGUARD VALLEY
FORGE FUNDS, ON BEHALF OF ITS
VANGUARD BALANCED INDEX FUND
SERIES; VANGUARD WHITEHALL FUNDS,
ON BEHALF OF ITS VANGUARD EMERGING
MARKETS GOVERNMENT BOND INDEX
FUND SERIES; VANGUARD BOND INDEX
FUNDS, ON BEHALF OF ITS VANGUARD
INTERMEDIATE-TERM BOND INDEX FUND
SERIES, VANGUARD LONG-TERM BOND
INDEX FUND SERIES, VANGUARD SHORT-
TERM BOND INDEX FUND SERIES,
VANGUARD TOTAL BOND MARKET INDEX
FUND SERIES, AND VANGUARD TOTAL
BOND MARKET II INDEX FUND SERIES;
VANGUARD FIXED INCOME SECURITIES
FUNDS, ON BEHALF OF ITS VANGUARD
INTERMEDIATE-TERM INVESTMENT-
GRADE FUND SERIES, VANGUARD LONG-
TERM INVESTMENT-GRADE FUND SERIES,
AND VANGUARD SHORT-TERM

CIVIL ACTION NO:


**COMPLAINT**
**<u>JURY TRIAL DEMANDED</u>**

INVESTMENT-GRADE FUND SERIES;                       :
VANGUARD CHARLOTTE FUNDS, ON                        :
BEHALF OF ITS VANGUARD TOTAL                        :
INTERNATIONAL BOND INDEX FUND                       :
SERIES; VANGUARD VARIABLE INSURANCE                 :
FUNDS, ON BEHALF OF ITS VVIF SHORT-                 :
TERM INVESTMENT-GRADE PORTFOLIO                     :
SERIES AND VVIF TOTAL BOND MARKET                   :
INDEX PORTFOLIO SERIES,                             :
                                                    :
                    Plaintiffs,                     :
                                                    :
        v.                                          :
                                                    :
PETROLEO BRASILEIRO S.A. - PETROBRAS;               :
PETROBRAS GLOBAL FINANCE B.V.;                      :
PETROBRAS INTERNATIONAL FINANCE                     :
COMPANY S.A.; MARIA DAS GRAÇAS SILVA                :
FOSTER; JOSE SERGIO GABRIELLI DE                    :
AZEVEDO; ALMIR GUILHERME BARBASSA,                  :
                                                    :
                    Defendants.                     :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES ........................................................................................................... 6

        A.      Plaintiffs ................................................................................................. 6

        B.      Defendants ............................................................................................. 8

IV.     PETROBRAS SECURITIES ............................................................................ 9

        A.      ADRs ...................................................................................................... 10

        B.      2003 – 2011 Notes ................................................................................. 10

        C.      2012, 2013, and 2014 Notes ................................................................. 12

V.      PETROBRAS BACKGROUND ...................................................................... 14

        A.      Petrobras, One of the World's Largest Oil and Gas Companies, Sought Massive
                Capital Investments ............................................................................... 14

        B.      Petrobras Relied on U.S. Securities Markets to Fuel Its Growth Plans and
                Defendants Assured Investors That Petrobras Would Be Transparent and
                Responsible In Managing Its Growth ................................................... 17

        C.      Plaintiffs' Investments In Petrobras ...................................................... 19

VI.     DEFENDANTS HAVE ADMITTED TO ENGAGING IN AN UNDISCLOSED
        KICKBACK SCHEME THAT INFLATED COSTS AND OVERSTATED EARNINGS
        AND VALUE ................................................................................................... 19

        A.      Petrobras Participated In a Bid-Rigging Scheme To Inflate Contracts ............... 22

        B.      Petrobras Executives Demanded That All Contracts Include an Additional Bribe
                Fee as a Kickback to Petrobras Employees and Government Officials ............... 25

        C.      Examples of Projects and Transactions Implicated in the Scheme ...................... 28

        D.      The Kickback Scheme Was Orchestrated at Petrobras' Highest Levels ............. 29

                1.      Brazilian Investigations Have Exposed Senior Petrobras Executives' Key
                        Roles in the Fraud ................................................................................... 30

                2.      Petrobras Executives Silenced Whistleblowers ....................................... 31

                3.      Petrobras Executives Were Necessarily Aware of a Kickback Scheme
                        That Affected Contracts Worth Over $80 Billion .................................... 34

VII.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

AND OMISSIONS DURING THE RELEVANT PERIOD ............................................. 35

 A. Petrobras' Financial Statements Were Materially False and Misleading ............. 36

 B. Defendants Made Materially False and Misleading Statements in Registration Statements and Prospectuses.................................................................................... 40

 C. Defendants Made Materially False and Misleading Statements in Investor Conference Calls ................................................................................................... 41

 D. Petrobras Posted Materially False and Misleading Statements Online ................ 46

 E. Defendants Made Materially False and Misleading Statements Concerning the Company's Internal Controls ................................................................................. 51

 F. Defendants Made Materially False and Misleading Statements Concerning Compliance With By-Laws and Code of Ethics .................................................... 53

  1. Petrobras' By-Laws ................................................................................. 53

  2. Petrobras' Code of Ethics ....................................................................... 54

VIII. DEFENDANTS' SCHEME HAS BEEN INCREMENTALLY REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES ............................................................ 57

 A. The Press Begins To Unveil Defendants' Fraud.................................................... 57

 B. Petrobras Delays Its Financial Statements And Admits That The Kickback Scheme Reported in the Press Would Render Its Prior Statements Materially False ................................................................................................................................. 65

 C. Petrobras Admits the Kickback Scheme and Concedes Overstatement of Its Assets, But Does Not Correct Prior Financial Statements..................................... 70

 D. Additional Revelations of the Fraud Further Harm Petrobras' Stock Price ......... 76

 E. Petrobras Took a $17 Billion Write-Down But Failed to Adequately Write Down Assets Involved in the Kickback Scheme .............................................................. 77

  1. Petrobras Admitted to Massive Overstatement of Its Assets as a Result of Pervasive Fraud....................................................................................... 77

  2. Petrobras' Financials Are Overstated By Billions More Than It Has Disclosed ................................................................................................. 85

  3. Additional Disclosures Concerning The Fraud Have Led To Additional Losses ...................................................................................................... 89

IX. PLAINTIFFS' RELIANCE ................................................................................................. 94

X. LOSS CAUSATION............................................................................................................ 96

XI. THE INDIVIDUAL DEFENDANTS' LIABILITY............................................................. 97

 A. Foster..................................................................................................................... 100

|       | B.   | Gabrielli ............................................................................................ | 100 |
|       | C.   | Barbassa ........................................................................................... | 101 |
| XII.  | NO SAFE HARBOR ......................................................................................... | | 102 |
| XIII. | EXCHANGE ACT AND STATE LAW FRAUD-BASED CLAIMS ........................... | | 102 |

COUNT I ............................................................................................................ 102

For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
............................................................................................................................ 102

Against All Defendants ...................................................................................... 102

COUNT II .......................................................................................................... 104

For Violation of § 20(a) of the Exchange Act ................................................... 104

Against the Individual Defendants .................................................................... 104

COUNT III ......................................................................................................... 104

For Violation of Pennsylvania Securities Act § 1-401 ..................................... 104

Against All Defendants ...................................................................................... 104

COUNT IV.......................................................................................................... 105

For Violation of Pennsylvania Securities Act § 1-501 ..................................... 105

Against Petrobras, PGF, and PifCo.................................................................... 105

| XIV.  | SECURITIES ACT AND STATE LAW CLAIMS...................................................... | | 106 |
|       | A.   | Overview............................................................................................ | 106 |
|       | B.   | False and Misleading Statements...................................................... | 107 |
|       |      | 1.    Petrobras' Financial Statements Were Materially False and Misleading | 107 |
|       |      | 2.    Defendants Made Materially False and Misleading Statements in Investor Conference Calls ....................................................................... | 110 |
|       | C.   | Petrobras Posted Materially False and Misleading Statements Online .............. | 114 |
|       | D.   | Defendants Made Materially False and Misleading Statements Concerning Compliance With By-Laws.............................................. | 118 |

COUNT V ........................................................................................................... 118

For Violation of Section 11 of the Securities Act............................................. 118

Against All Defendants ...................................................................................... 118

COUNT VI.......................................................................................................... 120

For Violation of Section 12(a)(2) of the Securities Act.................................... 120

Against Petrobras, PGF and PifCo..................................................................... 120

COUNT VII ................................................................................................ 121

For Violation of Section 15 of the Securities Act........................................ 121

Against the Individual Defendants............................................................... 121

COUNT VIII .............................................................................................. 123

For Violation of Pennsylvania Securities Act § 1-501 ................................ 123

Against Petrobras, PGF, and PifCo............................................................. 123

XV.   PRAYER FOR RELIEF ............................................................................. 124

XVI.  JURY TRIAL DEMANDED ..................................................................... 125

Plaintiffs (also referred to as "Vanguard Funds"), all trusts and investment companies affiliated with The Vanguard Group, Inc. (together with Plaintiffs hereafter, "Vanguard"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of documents created and/or published by Petroleo Brasileiro S.A.- Petrobras ("Petrobras" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about Petrobras, testimony by people involved in the wrongdoing alleged herein, releases and other public statements issued by Petrobras and media reports about Petrobras and the other named defendants. Plaintiffs' allegations are made upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be further revealed after a reasonable opportunity for discovery.

## I.   **INTRODUCTION**

1.      This case concerns a multi-billion dollar fraud orchestrated by Petrobras and its top executives. In furtherance of the fraud, Petrobras conspired with a cartel of contractors to overpay for more than $80 billion of construction contracts, from which a percentage was kicked back to Petrobras executives and Brazilian government officials. Petrobras failed to disclose the kickback and bribery scheme to investors and instead massively overstated its assets and profitability and made other material misrepresentations and omissions during the December 8, 2009 through October 9, 2015 period (the "Relevant Period").

2.      Petrobras has admitted to the fraud. In an April 22, 2015 filing, Petrobras admitted that Petrobras executives "colluded" with a "large number of contractors" to "overcharge Petrobras under construction contracts" and "used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor

personnel, or the former Petrobras personnel." As this admission shows, Petrobras acknowledges the awarding of inflated contracts to the cartel, as well as the kickbacks to Petrobras executives and their political allies. According to prosecutors, the scheme involved at least $800 million in bribes and other illegal payments.

3.     Petrobras has also admitted that its financial statements contained material misstatements tied to the fraud. In a January 28, 2015 SEC filing, Petrobras acknowledged that payments were "improperly recognized as part of the costs of our fixed assets, therefore requiring adjustments." In April 2015, Petrobras reported specific overcharges relating to the fraud and announced a $17 billion write-down and impairment charge. Authorities estimate that the scheme diverted more than $28 billion from Petrobras' coffers. According to Brazilian prosecutors, Petrobras' estimates in connection with the disclosed fraud were too conservative, and it is expected that significant additional adjustments will be necessary to fully account for the fraud.

4.     Details of the Petrobras scheme gradually emerged starting in September 2014, as a result of a plea bargain with a former Petrobras executive arrested on money laundering charges, Chief Downstream Officer Paulo Roberto Costa ("Costa"). According to Costa and others, kickbacks to Petrobras executives and Brazilian government officials were commonplace. During the Relevant Period, companies to whom Petrobras awarded inflated construction contracts paid at least hundreds of millions of dollars in kickbacks to Petrobras executives and in bribes to Brazilian politicians whose support Defendants required.

5.     Revelations of the fraud prompted investigations of Petrobras and others by the authorities in both Brazil and the United States, including Brazilian federal and state prosecutors, the Brazilian Securities and Exchange Commission ("CVM"), and the U.S.

Securities and Exchange Commission ("SEC") and Department of Justice. Those investigations are ongoing, and numerous people involved in the scheme have already been arrested, convicted, and sentenced, including Costa.

6.      The three Petrobras executives named as Defendants in this action participated in the fraud and cover up. Defendant Jose Sergio Gabrielli de Azevedo ("Gabrielli") was Petrobras' CEO from July 2005 to February 2012, and a Brazilian court has already frozen his assets on suspicion that he participated in the fraud. Defendant Maria Das Graças Silva Foster ("Foster") was Petrobras' CEO after Gabrielli, and she has also been implicated in the fraudulent scheme. Defendant Almir Guilherme Barbassa ("Barbassa") served as Petrobras' Chief Financial Officer ("CFO") and Chief Investor Relations Officer from July 2005 to February 2015, and he was responsible for many material misstatements and omissions.

7.      In total, during the Relevant Period, Petrobras paid billions of dollars in inflated contracts and illegal bribes and then improperly recorded those amounts as assets in the Company's financial statements. Petrobras did so to conceal those improper payments from investors in violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS"). Petrobras then used those materially misstated and inflated financial statements to raise billions of dollars from investors through the capital markets and to continue funding the fraudulent scheme.

8.      During the Relevant Period, Defendants also made materially false statements concerning Petrobras' internal controls and corporate governance and ethical business practices. To gain access to the U.S. capital markets and raise billions of dollars from investors, Defendants falsely assured investors that Petrobras met the requirements of the Sarbanes-Oxley Act and other regulations and would comply with specific bylaws and ethical standards.

Defendants also repeatedly denied the existence of any corrupt practices and touted certain purported anti-corruption policies. Defendants continued to do that into and throughout most of 2014.

9. Even after the first class action complaint was filed against Petrobras on December 8, 2014, Petrobras continued to make materially false statements to try to cover up the fraud and limit the fallout from the disclosure of the fraud. On October 27, 2014, Petrobras filed a Form 6-K acknowledging for the first time that the fraud could have a material impact on it, but Petrobras then refused to acknowledge or account for the full extent of the fraud. In April 2015, Petrobras reported total overcharges of only $2.5 billion from the scheme. Brazilian prosecutors subsequently reported that amount was too little, and in November 2015 said in court documents that the inappropriate payments by Petrobras may have amounted to as much as 42.8 billion reais, or about $11.1 billion.

10. As a result of the alleged wrongful conduct detailed in this complaint, Petrobras Securities (as defined below) traded at artificially inflated prices and Plaintiffs purchased Petrobras Securities at artificially inflated prices. As investors began to learn about the nature and scope of the fraud, beginning in September 2014, the prices of Petrobras Securities declined significantly, causing losses and damages to Plaintiffs. The disclosure of that fraud and resulting losses continued through the end of the Relevant Period, during which time Defendants refused to acknowledge and account for the full extent of the fraud.

11. Plaintiffs assert claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), the Securities Act of 1933 (the "Securities Act"), and the Pennsylvania Securities Act based on Petrobras Securities that Plaintiffs purchased on the New York Stock Exchange ("NYSE") or otherwise irrevocably committed to acquire in the United States, issued

4

by Petrobras and its two wholly-owned subsidiaries—Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF").

12.     Plaintiffs allege that Defendants are liable for material misstatements and omissions in the offering documents issued in connection with three public offerings registered in the United States.  For purposes of the Securities Act and certain state law claims, Plaintiffs are not alleging that Defendants committed fraud or acted with deceitful intent.  Rather, the Securities Act claims are based solely on strict liability and negligence.  The Securities Act claims do not allege, arise from, or sound in, fraud.

## II.    JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, §§ 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o, and the Pennsylvania Securities Act, 70 P.S. §§ 1-401, 1-501.

14.     This Court has jurisdiction over this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1331 and 1367.

15.     Venue is properly laid in this District pursuant to § 27 of the Exchange Act, § 22(a) of the Securities Act, and 28 U.S.C. § 1391(b).  Plaintiffs are headquartered in Malvern, Pennsylvania, Defendants made misrepresentations to Plaintiffs in Pennsylvania, and Plaintiffs irrevocably committed to purchasing Petrobras Securities in this district.  This case is not eligible for compulsory arbitration under Local Rule 53.2 because Plaintiffs seek money damages exceeding the arbitrable amount and Plaintiffs also seek equitable relief.

16.     Petrobras is not immune from jurisdiction of the United States courts under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611, as

this action is based upon a commercial activity carried on in the United States by Petrobras; or upon an act performed in the United States in connection with a commercial activity of Petrobras elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of Petrobras elsewhere that caused a direct effect in the United States. *See* 28 U.S.C. § 1605(a)(2).

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate telephone communications.

## III.   PARTIES

### A.     Plaintiffs

18.     Plaintiffs are Vanguard-affiliated investment companies that suffered losses on their purchase or acquisition of Petrobras Securities in the United States during the Relevant Period:

   a.     Vanguard International Equity Index Funds, on behalf of its Vanguard Emerging Markets Stock Index Fund series, Vanguard FTSE All-World ex-US Index Fund series, and Vanguard Total World Stock Index Fund series.  Vanguard International Equity Index Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

   b.     Vanguard Specialized Funds, on behalf of its Vanguard Energy Fund series.  Vanguard Specialized Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

   c.     Vanguard STAR Funds, on behalf of its Vanguard Total International Stock Index Fund series.  Vanguard STAR Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

   d.     Vanguard Trustees' Equity Fund, on behalf of its Vanguard International Value Fund series and Vanguard Emerging Markets Select Stock Fund series.  Vanguard Trustees' Equity Fund is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an

open-ended management investment company.

e.  Vanguard Chester Funds, on behalf of its Vanguard PRIMECAP Fund series.  Vanguard Chester Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

f.  Vanguard Fenway Funds, on behalf of its Vanguard PRIMECAP Core Fund series.  Vanguard Fenway Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

g.  Vanguard Valley Forge Funds, on behalf of its Vanguard Balanced Index Fund series.  Vanguard Valley Forge Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

h.  Vanguard Whitehall Funds, on behalf of its Vanguard Emerging Markets Government Bond Index Fund series.  Vanguard Whitehall Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

i.  Vanguard Bond Index Funds, on behalf of its Vanguard Intermediate-Term Bond Index Fund series, Vanguard Long-Term Bond Index Fund series, Vanguard Short-Term Bond Index Fund series, Vanguard Total Bond Market Index Fund series, and Vanguard Total Bond Market II Index Fund series.  Vanguard Bond Index Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

j.  Vanguard Fixed Income Securities Funds, on behalf of its Vanguard Intermediate-Term Investment-Grade Fund series, Vanguard Long-Term Investment-Grade Fund series, and Vanguard Short-Term Investment-Grade Fund series.  Vanguard Fixed Income Securities Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

k.  Vanguard Charlotte Funds, on behalf of its Vanguard Total International Bond Index Fund series.  Vanguard Charlotte Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

l.  Vanguard Variable Insurance Funds, on behalf of its VVIF Short-Term Investment-Grade Portfolio series and VVIF Total Bond Market Index Portfolio series.  Vanguard Variable Insurance Funds is a Delaware statutory trust registered with the SEC under the Investment Company

Act of 1940 as an open-ended management investment company.

**B.    Defendants**

19.    Defendant Petrobras operates as an integrated oil and gas company in Brazil and internationally.  Defendant Petrobras maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  The Company bases its Global Investor Relations department out of its office in New York.

20.    Defendant Petrobras Global Finance B.V. ("PGF") is a wholly-owned subsidiary of Petrobras incorporated in the Netherlands.  Its principal office is located at Weekapoint Toren A, Weena 722 3014 DA Rotterdam, The Netherlands.  Petrobras unconditionally guaranteed PGF's publicly issued debt.

21.    Defendant Petrobras International Finance Company S.A. ("PifCo"), between the start of the Relevant Period and August 9, 2013, was Petrobras' wholly-owned Cayman Islands subsidiary that functioned as a vehicle to raise funds for Petrobras through issuing debt securities in the international capital markets, among other means.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with its principal executive office at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, PifCo spun off certain assets and liabilities to Petrobras.  On February 12, 2014, PGF acquired the outstanding shares of PifCo as an initial step in the merger of PifCo into PGF.  On December 29, 2014, PifCo was merged into PGF, leaving PGF as the surviving entity and successor to all of PifCo's liabilities.  All allegations against PifCo are made against PGF as the corporate successor of PifCo.  Petrobras unconditionally guaranteed PifCo's publicly issued debt.

22.    Defendant Maria Das Graças Silva Foster ("Foster") served as Petrobras' CEO from February 2012 and Chief International Officer from July 2012 until her resignation from the Company on or about February 6, 2015.  During that time, Defendant Foster certified and

signed the Company's periodic financial reports filed with the SEC and participated in the

Company's periodic calls with investors. Defendant Foster signed or authorized the signing of

the 2012 Registration Statement and the 2011, 2012, and 2013 Forms 20-F. Defendant Foster

also served as a member of Petrobras' Board of Directors ("Board"). From September 2007

through January 2012, Foster served as Petrobras' Chief Gas & Power Officer.

23.     Defendant Jose Sergio Gabrielli de Azevedo Gabrielli ("Gabrielli") served as

Petrobras' CEO and a Board member from July 2005 to February 2012. During that time,

Defendant Gabrielli certified and signed the Company's periodic financial reports filed with the

SEC and participated in the Company's periodic calls with investors. Defendant Gabrielli

signed the 2009 and 2010 Forms 20-F. Defendant Foster replaced Defendant Gabrielli on

February 13, 2012 as Petrobras' CEO. A Brazilian state court froze Defendant Gabrielli's assets

on suspicion that he participated in the scheme.

24.     Defendant Almir Guilherme Barbassa ("Barbassa") served as Petrobras' Chief

Financial Officer ("CFO") and Chief Investor Relations Officer from July 2005 until his

resignation on or about February 6, 2015. During that time, Defendant Barbassa certified and

signed the Company's periodic financial reports filed with the SEC and participated in the

Company's periodic calls with investors. Defendant Barbassa signed or authorized the signing

of the 2012 Registration Statement and the 2010, 2011, 2012, and 2013 Forms 20-F.

25.     Defendants Foster, Gabrielli, and Barbassa are collectively referred to herein as

the "Individual Defendants." Defendants Petrobras, PGF, PifCo, and the Individual Defendants

are collectively referred to herein as the "Petrobras Defendants."

## IV.     PETROBRAS SECURITIES

26.     The below securities are collectively referred to in this complaint as the

9

"Petrobras Securities."

### A.      ADRs

27.     Petrobras American Depositary Receipts ("ADRs") representing the Company's common and preferred equity have been traded on the NYSE since 2000 and 2001, under the ticker symbols "PBR" ("Petrobras Common ADRs") and "PBR/A" ("Petrobras Preferred ADRs").

### B.      2003 – 2011 Notes

28.     On August 14, 2002, Petrobras and PifCo filed a registration statement for the offer and sale of up to $8 billion in securities, including debt securities, at indeterminate offering prices.  On December 3, 2003, pursuant to this registration statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $750 million in debt securities paying 8.375% due in 2018, available under Committee on Uniform Security Identification Procedures ("CUSIP") number 71645WAH4.

29.     On July 18, 2005, Petrobras and PifCo filed a registration statement for the offer and sale of up to $6.5 billion in securities, including debt securities, at indeterminate offering prices.  On October 6, 2006, pursuant to this registration statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $500 million in debt securities paying 6.125% due in 2016, available under CUSIP number 71645WAL5.

30.     On December 18, 2006, Petrobras and PifCo filed a registration statement for the offer and sale of an indeterminate amount of securities, including debt securities, at indeterminate offering prices (the "2006 Registration Statement").  On October 31, 2007, pursuant to the 2006 Registration Statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $1 billion in debt securities paying 5.875% due in 2018,

available under CUSIP number 71645WAM3.  On January 11, 2008, Petrobras supplemented the October 2007 issuance with an additional $750 million in debt securities with the same interest rate, maturity date, and CUSIP.

31.     On February 11, 2009, pursuant to the 2006 Registration Statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $1.5 billion in debt securities paying 7.875% due in 2019, available under CUSIP number 71645WAN1.  On July 1, 2009, Petrobras supplemented the February 2009 issuance with an additional $1.25 billion in debt securities with the same interest rate, maturity date, and CUSIP.

32.     On October 30, 2009, pursuant to the 2006 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of $4 billion in debt securities in two different series of notes: (1) a $2.5 billion offering paying 5.750% due in 2020, available under CUSIP number 71645WAP6; and (2) a $1.5 billion offering paying 6.875% due in 2040, available under CUSIP number 71645WAQ4.

33.     On December 11, 2009, Petrobras and PifCo filed a registration statement for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2009 Registration Statement").

34.     On January 27, 2011, pursuant to the 2009 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of $6 billion in debt securities in three series of notes: (1) a $2.5 billion offering paying 3.875% due in 2016, available under CUSIP number 71645WAT8; (2) a $2.5 billion offering paying 5.375% due in 2021, available under CUSIP number 71645WAR2; and (3) a $1 billion offering paying 6.750% due in 2041, available under CUSIP number 71645WAS0.

11

### C.      2012, 2013, and 2014 Notes

35.      On February 6, 2012, pursuant to the 2009 Registration Statement, Petrobras and

PifCo filed a prospectus supplement (the "2012 Prospectus Supplement" and together with the

2009 Registration Statement, the "2012 Offering Documents") for the offer and sale of $7

billion in debt securities in four different series of notes: (1) a $2.75 billion re-opening of notes

first offered on January 27, 2011 paying 5.375% due in 2021, available under CUSIP number

71645WAR2; (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying

6.750% due in 2041, available under CUSIP number 71645WAS0; (3) $1.25 billion of notes

paying 2.875% due in 2015, available under CUSIP number 71645WAV3); and (4) $1.75

billion of notes paying 3.500% due in 2017, available under CUSIP number 71645WAU5

(collectively, the "2012 Notes").

36.      On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement for

the offer and sale of an indeterminate amount of securities at indeterminate offering prices,

including debt securities (the "2012 Registration Statement").  The 2012 Registration Statement

included a prospectus that incorporated by reference certain documents filed by Petrobras with

the SEC, including (1) the combined Petrobras and PifCo Form 20-F for the year ended

December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A,

filed with the SEC on July 9, 2012; and (2) the Petrobras Form 6-K for the six-month periods

ended June 30, 2012 and 2011.

37.      On May 13, 2013, Petrobras issued a press release announcing the issuance of

$11 billion in debt securities to be issued by PGF.  On May 15, 2013, PGF filed a prospectus

supplement for the offer and sale of six series of notes pursuant to the 2012 Registration

Statement (the "2013 Prospectus Supplement" and together with the 2012 Registration

12

Statement, the "2013 Offering Documents"): (1) $1.25 billion of notes paying 2.000% due in 2016 to be sold at $995.84 per $1,000 par value, available under CUSIP number 71647NAC3; (2) $2 billion of notes paying 3.000% due in 2019 to be sold at $993.52 per $1,000 par value, available under CUSIP number 71647NAB5; (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1,000 par value, available under CUSIP number 71647NAF6; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1,000 par value, available under CUSIP number 71647NAA7; (5) $1 billion of floating-rate notes due in 2016 to be sold at par, available under CUSIP number 71647NAD1; and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par , available under CUSIP number 71647NAE9 (collectively, the "2013 Notes").

38. In addition to the documents incorporated by the 2012 Registration Statement, the 2013 Prospectus Supplement incorporated by reference, among other documents, the Company's Form 20-F for the year ended December 31, 2012 filed with the SEC on April 29, 2013, which included descriptions of Petrobras, its asset values, expenses, net income, and internal controls.

39. On March 10, 2014, Petrobras issued a press release announcing the issuance of $8.5 billion in debt securities to be issued by PGF. On March 11, 2014, PGF filed a prospectus supplement for the offer and sale of six series of notes pursuant to the 2012 Registration Statement (the "2014 Prospectus Supplement" and together with the 2012 Registration Statement, the "2014 Offering Documents"; together, the 2012 Offering Documents, 2013 Offering Documents and 2014 Offering documents are the "Offering Documents"): (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1,000 par value, available under CUSIP number 71647NAG4; (2) $1.5 billion of notes paying 4.875% due in 2020 to be

13

sold at $997.43 per $1,000 par value, available under CUSIP number 71647NAH2; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1,000 par value, available under CUSIP number 71647NAM1; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1,000 par value, available under CUSIP number 71647NAK5; (5) $1.4 billion of floating-rate notes due in 2017 to be sold at par, available under CUSIP number 71647NAJ8; and (6) $500 million of floating-rate notes due 2020 to be sold at par, available under CUSIP number 71647NAL3 (collectively, the "2014 Notes", and together with the 2012 Notes and 2013 Notes, the "Notes Offerings").

40.     In addition to the documents incorporated by the 2012 Registration Statement, the 2014 Prospectus Supplement incorporated by reference, among other documents, the Company's Form 20-F for the year ended December 31, 2012 filed with the SEC on April 29, 2013.  The 2014 Prospectus Supplement also incorporated the Company's press release issued March 7, 2014 regarding the Company's internal controls over financial reporting, which stated:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

## V.     PETROBRAS BACKGROUND

### A.     Petrobras, One of the World's Largest Oil and Gas Companies, Sought Massive Capital Investments

41.     Petrobras is one of the world's largest integrated oil and gas companies. Petrobras, directly or through its subsidiaries, prospects and drills for, refines, processes, trades, and transports crude oil from production in onshore and offshore oil fields and from shale or other rocks, as well as its oil products, natural gas and other liquid hydrocarbons.  In addition,

Petrobras carries out energy-related activities, such as research, development, production, transport, distribution, and trading of all forms of energy, as well as any other correlated or similar activities.  Petrobras controls more than 90% of Brazil's oil production and it owns more than 90% of that country's refineries.  Petrobras also operates in 16 other countries, including the United States, where the Company focuses on deepwater oil exploration in the Gulf of Mexico.

42.     During the Relevant Period, as required by Brazilian law, the Brazilian Federal Government owned a majority of Petrobras' voting stock.  As of December 31, 2014, the Brazilian Federal government owned 50.26% of Petrobras' common voting shares.  As a result, the Brazilian Federal Government during the Relevant Period had the power to elect a majority of the Company's Board and, through them, the "Executive Directorate," which was selected by and reported directly to the Board.  The Executive Directorate consists of the Company's CEO and six senior-most officers.

43.     Prior to and during the Relevant Period, Petrobras regularly made large capital expenditures on the construction and development of oil rigs, pipelines, refineries and other assets necessary for the operation of its business.  These assets were listed on the Company's balance sheet as "Property, Plant and Equipment" ("PP&E").  As of December 31, 2013, for example, Petrobras represented that PP&E assets totaled $227.90 billion and accounted for approximately 71% of the Company's total assets.

44.     According to Petrobras' Form 20-F for the year ended December 31, 2013, PP&E is "measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated costs of dismantling and removing the asset and

15

restoring the site and reduced by accumulated depreciation and impairment losses." Thus, the value of Petrobras' assets recorded on its financial statements is directly correlated with the costs incurred in connection with the completion of the related contracts.

45.     Petrobras' need for outside capital grew in 2006 with the discovery of massive oil fields located miles off of Brazil's coastline. These fields were the largest oil discoveries in the Americas in decades and promised to make Brazil one of the largest oil-producing countries in the world.

46.     When these vast new oil reserves were discovered in 2006, the Brazilian government suspended all development while it re-wrote the laws to grant Petrobras the right to be the sole operator of oil fields where licenses had not yet been auctioned and to grant Petrobras a minimum 30% stake in joint ventures to bid for exploration licenses.

47.     Exploration and development in the newly-discovered offshore oil fields was challenging and expensive. The fields were located 300 kilometers from Brazil's coastline in water more than 2,000 meters deep and below a thick salt layer (more than 2,000 meters), with often severe oceanic conditions. Analysts estimated that a single well would cost $100 to $150 million to develop, and one field alone could require up to 200 wells and $600 billion in capital investments over the life of the wells. Petrobras would then be required to build or lease enormous floating production, storage and offloading vessels ("FPSOs"), each of which cost hundreds of millions of dollars.

48.     Shortly after discovering these new oil fields, on August 14, 2007, Petrobras announced a strategic plan calling for $112.4 billion in capital expenditures through 2012 to develop these resources, amounting to $22.5 billion per year. This business plan envisioned that Petrobras would nearly double its daily production of oil and gas from 2.3 million barrels per

day in 2006 to 4.2 million barrels by 2015. The plan also envisioned nearly doubling domestic refining capacity from 1.4 million barrels per day in 2006 to 2.4 million barrels per day in 2015.

49.     To that end, Petrobras also announced plans to expand its refining capacity by building Brazil's first new oil refineries since 1980. Defendant Gabrielli claimed in 2008 that Petrobras' major refinery projects, Abreu e Lima ("Abreu"; sometimes referred to as "RNEST") and Complexo Petroquimico do Rio de Janeiro ("Comperj"), would transform Brazil's economy by enabling the country to reach "self-sufficiency in oil refining by 2015." Like the oil production projects, Petrobras' expansion of its refining capacity would require enormous capital expenditures.

50.     The market embraced Petrobras' growth prospects, causing the price of Petrobras shares to soar. By summer 2008, the Company's market capitalization exceeded $250 billion, making it one of the largest publicly held companies in the world. Following the collapse in the Company's share price as a result of the bribery scandal, its market capitalization has fallen to approximately $33 billion, down over 80% from its 2008 peak.

51.     On June 14, 2012, Petrobras announced its intent to ratchet up its strategic growth plan, disclosing a plan to make an additional $236.5 billion in capital expenditures through 2016—a target of $47.3 billion per year. The Company also announced its goal to produce 5.7 million barrels of oil per day by 2020, a considerable increase over its prior target of 4.2 million barrels by 2015.

> **B.     Petrobras Relied on U.S. Securities Markets to Fuel Its Growth Plans and Defendants Assured Investors That Petrobras Would Be Transparent and Responsible In Managing Its Growth**

52.     Petrobras relied heavily on access to U.S. securities markets to raise the capital necessary to achieve its ambitious growth targets. For example, on September 2, 2010,

Petrobras raised over $7 billion through the issuance of common and preferred ADRs on the NYSE.  Combined with a concurrent equity offering in Brazil, this September 2010 equity offering, totaling $70 billion, was the largest in history by any company.

53.     In marketing the offering to investors, Petrobras claimed that it would use the proceeds to make capital investments pursuant to its strategic business plan, including the funding of a $42 billion payment to the Brazilian government in exchange for the right to develop certain oil fields.

54.     To raise capital in the United States, Petrobras represented to investors and ratings agencies that it met the requirements of the Sarbanes-Oxley Act ("SOX") and was subject to "oversight by the Securities and Exchange Commission in the U.S. ('SEC'), and to all the rules of governance and disclosure of relevant information to the market."  Petrobras further represented that its financial statements were accurate and that it would provide accurate financial information and make other disclosures to investors in accordance with U.S. listing guidelines.

55.     These representations were important to investors who wished to buy a stake in a fast-growing oil and gas company, but needed assurances that Petrobras would be a prudent steward of the huge capital infusion necessary to meet its growth targets.

56.     Beginning with the Company's Annual Report on Form 20-F for the fiscal year ending December 31, 2006 and continuing during the Relevant Period, Petrobras was required to furnish, and did furnish, a report by management on its internal control over financial reporting. This report contained, among other things, an assessment of the effectiveness of the Company's internal controls over financial reporting, concluding (falsely) that its internal controls over financial reporting were effective.  This assessment was required to include disclosure of any

18

material weakness in internal control over financial reporting identified by management, but the Company disclosed none.

57.     The Company conducted, and to this day still conducts, extensive outreach to solicit investors in the United States through roadshows, investor days, individual meetings, earnings calls, and other communications.  The Company's representations to investors concerning its internal controls and financial discipline are critical to its access to U.S. capital markets, which in turn is necessary for the success of the Company's announced investment plans and business strategy.

## C.     Plaintiffs' Investments In Petrobras

58.     Plaintiffs purchased Petrobras Securities during the Relevant Period.  During the Relevant Period, Vanguard investment managers made investment decisions on behalf of the Vanguard funds described above.  These managers were located in Pennsylvania in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiffs in the United States to acquire the Petrobras Securities.

## VI.     DEFENDANTS HAVE ADMITTED TO ENGAGING IN AN UNDISCLOSED KICKBACK SCHEME THAT INFLATED COSTS AND OVERSTATED EARNINGS AND VALUE

59.     Starting prior to the Relevant Period and continuing for more than a decade, Petrobras, the Individual Defendants and other senior Petrobras executives, Brazilian Federal Government officials, and numerous Brazilian companies engaged in one of the largest kickback schemes in history, which created enormous undisclosed risks and inflated Petrobras' capital costs by causing the Company to overpay outside contractors in exchange for bribes to top Company executives and government officials.

60.     In addition to the individuals named as defendants in this action, the bid-rigging

and kickback scheme involved, among others:

a.    Roberto Costa ("Costa"), Petrobras' former Chief Downstream Officer and a member of the Company's seven-member "Executive Directorate" whose March 2014 arrest and August 2014 sworn testimony set off a wave of further investigations, arrests, and plea agreements;

b.    Pedro José Barusco Filho ("Barusco"), a former executive in the Company's services business segment, who, like Costa, has entered into a plea agreement and provided extensive testimony about the bribery scheme, and who has agreed to return approximately $97 million to the Company - representing bribes and capital gains on funds held in secret foreign bank accounts;

c.    Alberto Youssef ("Youssef"), a so-called "black-market central banker" and confessed money launderer who smuggled cash for Brazil's corrupt, rich and powerful and facilitated the bid rigging and kickback scheme, and who is cooperating with authorities;

d.    Renato de Souza Duque ("Duque"), the Company's former Chief Services Officer, who has been arrested twice, the second time after attempting to transfer 20 million euros from Swiss bank accounts to Monaco accounts, and who remains in custody in Brazil;

e.    Joao Vaccari Neto ("Neto"), the Treasurer of the Worker's Party (PT), who was charged with corruption and money laundering related to illegal campaign donations he solicited from Duque;

f.    Julio Camargo ("Camargo"), an executive at Toyo Setal Empreendimentos Ltda. ("Toyo"), a member of the cartel, who is cooperating with authorities and has detailed tens of millions of bribes paid to Barusco and Duque through intermediaries;

g.    Augusto Mendonca ("Mendonca"), also an executive at Toyo who is cooperating with authorities and has described the cartel and the payment of bribes to Petrobras executives through intermediaries like Youssef;

h.    Nestor Cerveró ("Cerveró"), the Company's former Chief International Officer, who was charged by Brazilian federal prosecutors in December 2014 in connection with $53 million in bribes; and

i.    Jorge Zelada ("Zelada"), a former member of Petrobras' Board of Directors, who is under investigation and whose $10.6 million bank account was frozen by Monaco.

61.    Petrobras' scheme has been the subject of an investigation by the Brazilian federal police code-named "Lava Jato," or "Car Wash," focused on a scheme run by black-

market money dealers, including career criminal and money launderer Youssef.

62.     On or about March 20, 2014, Brazilian police arrested Costa, but Defendants denied any wrongdoing or that the investigation would impact its financial reporting until October 27, 2014. Costa was a member of Petrobras' senior management and the Company's Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012. In that position, Costa was the top executive in charge of Petrobras' refining, transportation and marketing division and reported directly to the CEO of the Company (Defendant Gabrielli and then Defendant Foster).

63.     Costa subsequently agreed to cooperate with the prosecutors and has since testified that he turned Petrobras' Refining Division into a slush fund for the Workers' Party. Barusco, a former manager in Petrobras' Services Division, similarly testified at a Brazilian Congressional hearing that the Workers' Party received up to $200 million in payments that were skimmed from Petrobras contracts. Both Costa and Barusco have testified that the corruption, bribery, and intentional contract inflation at Petrobras lasted more than a decade.

64.     The unlawful conduct alleged in this complaint has so far resulted in more than 100 arrests and more than 30 convictions. Many of the people involved in the multi-year scheme have been sentenced to serve time in prison. For example, Neto has been sentenced to 15 years in prison, and Duque has been sentenced to 20 years in prison. On October 29, 2015, a Brazilian former lawmaker who was one of the top leaders of the Progressive Party, Pedro Correa, was sentenced to 20 years and seven months in prison for his role in the scheme. Barusco has agreed to return nearly $100 million hidden in offshore accounts.

65.     In December 2014, Brazil's Comptroller General initiated cases against eight construction companies with ties to Petrobras; in March 2015, the Comptroller General

21

announced it had opened cases against ten more.  So far, the scheme has implicated at least twenty-nine contractors, including some of the largest construction firms in Brazil.  The scheme also has implicated multi-national corporations, including corporations in Singapore, Switzerland, and the United Kingdom.

66.     As of March 2015, there had been over forty indictments for racketeering, bribery, and money laundering.  On July 20, 2015, executives of one of Brazil's largest construction companies were convicted on charges related to the Petrobras scandal, the first construction-industry executives to be convicted.  Additionally, prosecutors have asked the Brazilian Supreme Court to investigate dozens of sitting politicians, including the speakers of both houses of the Brazilian Congress, for allegedly receiving bribery money connected to Petrobras' kickback scheme.  On August 20, 2015, Brazilian authorities charged the speaker of Brazil's lower house of Congress and a former Brazilian president, Eduardo Cunha, with corruption.

67.     It is undisputed that the kickback scheme occurred.  As admitted by the Company in its Form 6-K filed on January 28, 2015 for the third quarter of 2014 (the "3Q14 Form 6-K"), "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the costs of our fixed assets, therefore requiring adjustments."  Petrobras was directly involved in the scheme, with two thousand Petrobras employees under investigation.

### A.     Petrobras Participated In a Bid-Rigging Scheme To Inflate Contracts

68.     Throughout the Relevant Period, Petrobras hired outside contractors to supply goods and/or services to Petrobras' various business segments, including those necessary to

22

construct new refineries.  Bidding for contracts was governed by the "Simplified Bidding Procedure Regulations" and the "Petrobras Procurement Manual."  These guidelines were intended to encourage open and honest bidding for contracts with the Company.  In 2011, Brazil enacted legislation called the "Differential Public Procurement Regime" to streamline procurement bids and contracts at Brazilian companies, including Petrobras.

69.    When the Differential Public Procurement Regime was enacted, Petrobras represented that "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts."

70.    The Company's Services Division largely managed Petrobras' procurement processes.  When business segments commissioned new projects for their division, the Services Division would create the basic design, conduct the bidding process, select the outside contractor(s) to execute the project, and oversee the construction of the project.  Upon completion, the business segment would take over the project.  From 2003 to 2012, Duque headed the Services Division.

71.    Contrary to Petrobras' representations to investors, construction companies and other firms doing business with Petrobras formed a secret cartel whereby the members agreed to inflate the cost of Petrobras contracts—with Petrobras' knowledge and consent.  The members of the cartel held meetings where they exchanged information concerning upcoming procurement invitations from Petrobras.  As Costa and Neto testified, these meetings were attended by high-level executives with "decision powers."

23

72.    According to Costa and others, whose testimony Petrobras cited in deciding to take a $2.5 billion write-down, the bid rigging scheme worked as follows:  The "cartelization" process began when Petrobras embarked on large projects, such as highly complex oil platforms and refineries in remote areas, necessary to build the upstream and downstream capacity required to exploit and process the huge quantities of oil and gas in its fields.  According to Costa, the cartel included each of the major Brazilian construction and engineering companies that had the ability to engineer and construct these projects, which meant that these companies could effectively dictate the bidding process and ultimately the price received by Petrobras.

73.    According to Costa, Petrobras would mechanically calculate the actual cost of performing the contract—that is, the cost of capital and labor and any other incidentals associated with the contract.  Petrobras was typically prohibited from accepting bids at prices higher than 20% over this internal calculation.  Petrobras would then select the contractors to bid on the projects and would secretly communicate that threshold to the cartel.  The cartel members would then place their bids significantly higher, indeed as high as possible, in the first round of bidding.  With respect to the Abreu refinery contracts, for example, Barusco testified that the initial bids were "stratospherically above" those in the Petrobras budget, sometimes almost double Petrobras' budget.

74.    Barusco explained that the next step was that Petrobras would typically reject all of those bids, which were "obviously excessive," and then a "re-bid" would occur.  At this step, Petrobras employees would "show representatives of the [cartel members] how they should present claims for contract addenda in order to avoid refusal" by Petrobras.  For the re-bid, a pre-selected winning bid would come in just under the 20% threshold, with the pre-selected losing bids coming in just above that threshold.  Barusco confirmed that "what [the cartel]

24

would do among themselves was define among themselves who would win a certain bid competition. Basically, with respect to the cartel, the intervention was along the lines of having management selection in favor of specific enterprises . . . . ." In this way, the winning and losing bids were chosen in advance, as confirmed in testimony from Youssef.

75.    The resulting contract prices were much higher than they would have been in a competitive bidding system. Costa explained that "the bribe comes from a percentage of the enterprise's previously established profit, which due to the lack of effective competition always stretches to the limit." Barusco explained that Petrobras would enter into inflated contracts with cartel members and that the cartel colluded with Petrobras to impose contract prices that were "way above budget." According to Barusco, and confirmed by Youssef, Petrobras' contracts with cartel members were always "signed near the maximum amount for the internal budget of Petrobras."

**B.    Petrobras Executives Demanded That All Contracts Include an Additional Bribe Fee as a Kickback to Petrobras Employees and Government Officials**

76.    After Petrobras paid the inflated amounts for the contracts, the recipient firms "kicked back" a percentage of the total contract value—approximately 3%—to senior Petrobras employees and others. Those Petrobras employees lined their own pockets from the kickbacks and also passed along some of the funds to senior Brazilian Federal Government officials in exchange for government support and to ensure that those officials would vote in line with Brazil's currently ruling Workers' Party, which in turn controlled Petrobras. This amount was referred to as a "political adjustment."

77.    Barusco maintained a spreadsheet that detailed the payment of bribes in connection with some of Petrobras' key projects. The co-conspirators would allocate kickbacks

of specific percentages among Petrobras executives and their political allies. According to Costa, in connection with cartel contracts, two-thirds of the 3% kickback was typically allocated to Petrobras executives. Of the remaining 1%, "60% went to the [political party], 20% was for expenses . . . and the remaining 20% was allocated 70% to me and 30% either to [Brazilian politicians or money launderers]."

78.     Because the contracts at issue were huge, the kickbacks were also enormous. As Barusco testified at a March 2015 Brazilian congressional hearing, Brazil's Worker's Party (PT) received up to $200 million in kickbacks through this scheme. Costa received his bribes "in cash, normally at [his] home or in a shopping mall, or at the office, after [he] opened [his] own consulting firm."

79.     According to Costa, the cartel was able to operate in secret for so long because of the tremendous power that Brazilian politicians and political parties had over the fate of Petrobras' executives and contractors. As Costa explained, there was "never, never" an instance where a cartel member refused to pay the illegal bribes because if the cartel member "did not contribute to a certain political party at that time, this would be reflected in other works at the government level, and the political parties would not look kindly to this . . . . If you create a problem on one side, it can create a problem on the other. So in my time there, I do not remember any company that failed to pay. There was, there were some delays, by cartel companies, but they never failed to pay."

80.     Corroborating Costa's testimony, Mendonca, one of the cartel executives cooperating with authorities, explained that members of the cartel knew that the payment of bribes to Petrobras senior executives was the only way to secure lucrative construction and engineering contracts. Mendonca testified specifically that "as for the payment of commissions

26

to Petrobras' directors, maybe that didn't even merit a discussion, because everyone was aware that it would be very much mandatory."

81.     Testimony by Costa and others also revealed the close relationship between Brazilian political parties and Petrobras' seven Executive Directors and their respective business segments. Because, as noted above, Brazil is a majority owner of Petrobras and controls a majority of the board seats, it is able to appoint the Company's powerful seven-member Executive Directorate. According to the testimony of Costa and others, in exchange for these political appointments to the vaunted Executive Directorate and subsequent political protection, Petrobras' executives and outside contractors were obligated to funnel some of the kickbacks to the Executive Director's political allies, including parties and elected officials.

82.     Costa testified extensively about the alignment between certain Petrobras business segments and certain political parties because "the departments of Petrobras, and the chairmanship of Petrobras were always by way of political appointments. I have always given the example here . . . of how generals never reach the rank of general without being appointed." Costa was appointed by the Progressive Party to take charge of the Downstream Division, and his future depended on maintaining a strong relationship with the party. In contrast, the exploration, gas and energy, and services departments were more aligned with the Workers Party.

83.     In the case of Duque, who headed the Services Division and has been arrested and charged twice, prosecutors allege that he conspired with Neto, the former Worker's Party Treasurer, to provide the party with illegal campaign donations in exchange for political protection. As the Brazilian prosecutor said in connection with the arrests of Duque and Neto in March 2015, the improper campaign donations "weren't illegal just because they were bribe

27

payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."

### C.  Examples of Projects and Transactions Implicated in the Scheme

84.     Investigations into Petrobras' bid-rigging and kickback scheme are ongoing. Below are examples of a few of the many Petrobras projects implicated in the scheme. Testimony and admissions from those involved in the scheme, information revealed by enforcement officials, and media reports have all revealed that the scheme was widespread and ongoing for many years.

85.     *The Pasadena, Texas Refinery*:  In 2006, Petrobras paid $360 million for a 50% interest in an oil refinery located in Pasadena, Texas (the "Pasadena Refinery").  This amount was more than eight times the $42.5 million that a Belgian oil company, Astra, had paid for the refinery one year earlier.  That 50% stake eventually cost Petrobras $820.5 million after interest and legal fees.  Ultimately, after litigation over Astra's exercise of a put option requiring Petrobras to purchase the remaining 50%, Petrobras paid a total of $1.18 billion for the refinery. Costa testified that Petrobras' International Director, Cerveró, pushed through this unfavorable transaction in order to obtain $20 to $30 million in bribes from Astra.

86.     *The Abreu Refinery*:  In 2005, Petrobras approved plans to build the Abreu refinery in Pernambuco, Brazil.  It was one of Brazil's first new oil refinery projects in years, and was reported to be Petrobras' largest single-investment project.  While the project's initial budget in 2006 was approximately $2.4 billion, by the time the refinery began operations in November 2014, the cost had escalated to more than $18 billion.  Costa was primarily responsible for Abreu, including negotiating with contractors.  Several individuals implicated in the Petrobras kickback scheme admitted that Abreu contracts were subject to illegal overbilling.

28

Costa and Barusco both testified that Petrobras entered into overbilled contracts with cartel members for Abreu projects. Erton Medeiros Fonseca, the CEO of Brazilian construction company Galvao Engenharia ("Galvao"), testified that Galvao bribed Petrobras to win Abreu construction contracts. And Venina Velosa da Fonseca, Petrobras' former manager of downstream operations, described a Petrobras internal audit that revealed that much of the cost increase at Abreu was due to add-on contracts awarded to cartel participants that approximated $3.1 billion in padded bills. This audit, which was presented to and approved by the Petrobras Board, blamed Costa for modifying the original plan of Abreu.

87.    **Comperj**: Comperj is a refining complex that broke ground in 2008 and began construction in 2015. As reported by *Bloomberg* on October 16, 2014, the Tribunal de Contas da União ("TCU") found that Petrobras must pay $21.6 billion to complete Comperj. According to an April 7, 2015 *Reuters* article entitled "Petrobras expects a $14.3 bln loss on Comperj refinery –O Globo," the unfinished refinery could cost Petrobras nearly 12 times more in losses than the plant is expected to return in cash flow during its lifetime. *Reuters* added that Comperj was one of the giant refinery projects, according to Brazilian police and prosecutors, on which a cartel of construction and engineering companies conspired with Petrobras executives to overcharge for work. On April 21, 2015, the *International Business Times* reported in an article entitled "Brazil: As Petrobras scandal spreads economic toll mounts" that construction at Comperj had come to a complete standstill, as Petrobras placed certain members of the cartel on a payment blacklist because of the Operation Car Wash bribery and kickback scheme.

### D.    The Kickback Scheme Was Orchestrated at Petrobras' Highest Levels

88.    Petrobras' kickback scheme was orchestrated at Petrobras' highest levels. During the Relevant Period, Petrobras' Executive Directorate was composed of individuals at

the center of the scheme alleged herein, as well as those who were aware of the scheme and its impact on the Company, including Costa (Director of Downstream/Supply), Duque (Chief Services Officer), Barusco (Executive Manager of Engineering and Duque's right-hand man), Cerveró (Director of International Division), Foster (Director of Gas & Energy until 2012 and then CEO), Barbassa (CFO), and Gabrielli (CEO from 2005 to February 2012).  Youssef testified that the "Directors of the services, international and supply areas knew for sure [about] the cartelization process" and that "the President of Petrobras probably knew."  Costa testified that the Company's Board approved all contracts for the Abreu refinery.

### 1.   Brazilian Investigations Have Exposed Senior Petrobras Executives' Key Roles in the Fraud

89.   Brazilian investigations into Petrobras' scheme have revealed that the fraud was operated at Petrobras' highest levels.  Numerous senior Petrobras executives, including Cerveró, former CFO of Petrobras Distribuidora, Costa, former Chief Downstream Officer, Duque, former Engineering, Technology and Materials Director, and Defendant Gabrielli, former Petrobras CEO and Board member, have been arrested or are being investigated in connection with the scheme.

90.   Petrobras executives, including Cerveró, Costa, Duque, Barusco, and Silas Oliva (former Communications Manager), have received requests for indictment from the Brazilian Chamber of Deputies, according to an English translation of a list of requests for indictment by Brazil's rapporteur of the Joint Parliamentary Committee of Inquiry, dated December 18, 2014.

91.   Numerous Petrobras executives have resigned as a result of the scheme, including Defendant Foster, Defendant Barbassa, Jose Miranda Formigli, former Upstream Director, and Jose Antonio de Figueiredo, Engineering, Technology and Procurement Director, according to Petrobras' Form 6-K filed on February 4, 2015.  José Sergio de Oliveira Machado

("Machado"), former CEO of Petrobras subsidiary Transpetro, went on unpaid leave, according to Petrobras' Form 6-K filed on January 23, 2015.

92.     Individuals involved in the kickback scheme have been convicted.  On April 22, 2015, Brazilian Judge Sergio Moro convicted eight individuals, including Costa, of racketeering and laundering money obtained from kickbacks on overvalued contracts, including those for the building of a Petrobras refinery in Pernambuco, Brazil between 2009 and 2014.  As of April 22, 2015, 97 individuals had been indicted on charges of corruption, money laundering, and cartel formation, and that number has increased since then.

93.     Even though officials are still investigating the kickback scheme, various individuals have had assets seized or have agreed to pay back money  For example, Costa has agreed to turn over assets, including $25.8 million, according to a *Bloomberg* article on October 1, 2014 entitled "Probed Petrobras Documents Show Duque Also Signed Contracts," and Defendant Gabrielli's assets were frozen, according to a *Reuters* article on January 29, 2015 entitled "Brazilian Court Freezes Assets of Former Petrobras CEO Gabrielli."

### 2.     Petrobras Executives Silenced Whistleblowers

94.     Petrobras retaliated against senior executives who tried exposing the kickback scheme.  For example, Petrobras retaliated against Venina Velosa da Fonseca ("Velosa"), Petrobras' former manager of downstream operations.  Velosa personally met with Defendant Foster in 2008 and also provided her with documents that reflected inflated contracts and payments for services that were not carried out.  Defendant Foster led Petrobras' Energy & Gas Division at that time and reported to Defendant Gabrielli.  Velosa also alerted Defendants Barbassa and Foster, the Petrobras Board, and others about irregularities with transactions.

95.     Velosa delivered documents and a computer to the Brazilian officials who are

leading the Operation Car Wash investigation.  These documents reflect warnings to senior Petrobras executives.  For example, Velosa discovered misappropriation of funds in the Communications Department of the Supply Division of Petrobras in 2008 and 2009 in the form of a pattern of contractors' rigging bids and overfilling them by up to 20% of the estimates. Velosa raised this issue to Costa, who insinuated that she would bring down important Brazilian politicians if she complained about the misappropriated funds.

96.     Velosa forwarded her complaints to Defendant Gabrielli.  Defendant Gabrielli created a committee to investigate these complaints, which ultimately found that Petrobras paid 58 million reais in contracts for communication services that were not performed.  In the morning of April 3, 2009, Velosa emailed Defendant Foster about the 58 million reais that was embezzled.  That same day, Velosa created a document entitled "Internal Document of the Petrobras System," in which she concluded that administrative irregularities, such as a scheme to divert money from Petrobras, existed in the Communications Department.  Velosa again wrote to Defendant Foster that same night to seek her help.

97.     After making these allegations of wrongdoing, in February 2010, Velosa was sent to Petrobras' Singapore division.  Velosa was asked not to do any work when arriving in Singapore.

98.     On October 7, 2011, Velosa emailed Defendant Foster about violations of Petrobras' Code of Ethics and serious problems with contracts and bids.  Velosa said that she could deliver documents to Defendant Foster about these problems, and she raised issues surrounding Costa.

99.     Velosa described a Petrobras internal audit, which was performed in June 2012, which revealed that much of the cost increase at the Abreu refinery was due to add-on contracts

32

awarded to the cartel contractors implicated in the kickback scheme. This cost increase was estimated to be $3.1 billion in padded bids. This internal audit also blamed Costa for modifying the original plan for Abreu to add unnecessary features, and it was presented to the Board, including Defendant Foster, who despite being informed of the loss, approved the unneeded additions to the project.

100.    On November 17, 2014, Velosa emailed Defendant Foster, explaining the harassment that Velosa faced in alerting Petrobras executives to the kickback scheme. She had had a gun pointed at her head and her daughters had been threatened. Velosa also explained in her email that she had documentation supporting the irregularities that she found. She explained that she had presented the matter to Petrobras' legal and audit departments and other competent authorities. And in Singapore, Velosa explained in her email that she had learned about other problems.

101.    Two days after Velosa's email to Defendant Foster on November 17, 2014, Petrobras' Board fired Velosa.

102.    The harsh treatment of Velosa after she communicated the misconduct at Petrobras to her superiors demonstrates that Petrobras management was aware of the kickback and bid-rigging scheme.

103.    Petrobras also retaliated against Mauro Rodrigues da Cunha ("Cunha"), an independent member of the Petrobras Board who rejected Petrobras' 2013 earnings report during a February 25, 2014 Petrobras Board meeting. Cunha stated that his decision to reject the earnings report was in part because he was not given sufficient time and information to analyze Petrobras' refinery investments. At the subsequent April 25, 2014 Petrobras Board meeting, the Board removed Cunha from the audit committee. Cunha has lodged a complaint

with Brazil's Securities and Exchange Commission concerning his removal and the committee's independence.

104.   Other Petrobras insiders spoke out against the Company's corrupt practices and were punished for doing so.  On January 7, 2015, Brazilian Federal Prosecutors deposed Fernando de Castro Sa ("Fernando"), a lawyer who worked in Petrobras' Downstream Division and regularly interacted with Duque and former CEO Gabrielli during the Relevant Period. Fernando testified about the significant "irregularities" he discovered at Petrobras and how he reported those irregularities to Defendant Gabrielli, Costa, Duque, and other Petrobras officials in 2008 and 2009.

105.   In early April 2009, Fernando drafted a legal opinion that concluded that Geovane de Morais should be terminated following Velosa's internal inquiry, which found that Morais was responsible for improper payments in the Downstream Division.  Later that same month, Fernando's superior informed Fernando that he had received a call at home from Duque and Gabrielli concerning Fernando's recommendation to dismiss Morais.  Fernando further testified that Petrobras' senior management determined that "the legal department [would] give an opinion revising the previous opinions" concerning the findings of improper payments.

106.   After speaking out against the improper payments, Petrobras transferred Fernando to a small, isolated office that had no computer.  Petrobras assigned Fernando no work, reduced his salary, and instructed his colleagues not to speak with him.  Additionally, Fernando's new role did not involve any interaction with outside contractors.

### 3.      Petrobras Executives Were Necessarily Aware of a Kickback Scheme That Affected Contracts Worth Over $80 Billion

107.   The knowledge and involvement of Petrobras senior executives is confirmed by the massive scale of the fraud and the impact on Petrobras.  As Petrobras' $17 billion write-

34

down indicates, contracts worth over $80 billion (representing approximately one-third of Petrobras' assets) were implicated in this fraudulent scheme, and each of those contracts necessarily involved many individuals to carry out the logistics of large scale bids involving dozens of the largest construction and engineering companies in Brazil. Costa explained that for each major contract, a bidding coordinator, together with a committee consisting of two or three members, would manage the bidding process with outside contractors.

108.   Barusco admitted that a new project relating to the Downstream Division would be tendered practically every month, and that each such project would be used to funnel bribes to Petrobras executives. One individual was convicted for receiving bribes in connection with 90 Petrobras contracts between 2003 and 2013. Given the "committee" structure of the bidding system, and the dollar value and number of contracts and bids at issue, the fraud could not have occurred without the knowledge and/or participation of, at the very least, dozens of individuals within Petrobras, who participated in, were aware of, and benefitted from the bid rigging and kickbacks.

## VII.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

109.   Throughout the Relevant Period, Defendants made many materially false and misleading statements and omissions to Plaintiffs and the public at large through oral and written communications. These included material misstatements concerning, among other things, (i) the existence of a kickback and bribery scheme; (ii) Petrobras' conspiracy with the cartel to fix bids on multi-billion contracts at inflated values; (iii) the value of Petrobras' assets, including property, plant and equipment ("PP&E"), and shareholder equity; (iv) Petrobras' profitability and expenses; (v) Petrobras' compliance with GAAP and IFRS accounting standards; and (vi) the integrity and reliability of Petrobras' internal controls and financial

35

reporting.

**A.     Petrobras' Financial Statements Were Materially False and Misleading**

110.    Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period.  In particular, by wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the value of its PP&E, its total assets, and its shareholder equity in each of its quarterly and annual financial statements during the Relevant Period.  In addition, Petrobras' net income and profitability was artificially and materially inflated during the Relevant Period because Petrobras failed to record an impairment charge – which would track through Petrobras' income statement – to correct for the improperly overstated PP&E values.  Petrobras also reported expenses during the Relevant Period that were materially understated because, as Petrobras has admitted, the improper kickback payments should have been classified as expenses, rather than assets booked under PP&E.

111.    Petrobras' May 28, 2010 Form 6-K represented that Petrobras' financial statements had "been prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made the same representations in each quarterly and annual statement it filed: the March 26, 2010 Form 6-K; August 25, 2010 Form 6-K; November 24, 2010 Form 6-K; March 17, 2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K.  Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this annual report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

112.    Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with GAAP, as Petrobras has now admitted.  These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADRs.  But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

113.    Following Petrobras' transition to IFRS reporting, the Company represented that Petrobras' financial statements were "presented" and/or "prepared" "in accordance with IAS [IFRS's International Accounting Standard] 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)" in its May 17, 2012 Form 6-K; August 10, 2012 Form 6-K; October 30, 2012 Form 6-K; April 30, 2013 Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; May 12, 2014 Form 6-K; and August 11, 2014 Form 6-K. Similarly, the Company's 2011 Form 20-F; 2012 Form 20-F; 2013 Form 20-F; February 29, 2012 Form 6-K; February 6, 2013 Form 6-K; and February 26, 2014 Form 6-K were false and misleading when made because the Company's financial statements were not prepared in accordance with IFRS, as Petrobras has admitted.

114.    Each of these representations was false and misleading when made because the Company's financial statements were not prepared in accordance with IFRS, as Petrobras has now admitted.  These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADRs.  But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

115.    The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by

37

Defendant and CEO Gabrielli and Defendant and CFO Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "fairly presents, in all material respects, the financial condition and results of operations of the Company." The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Defendants Foster and Barbassa. The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E: "[PP&E] are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses."

116. Each of these representations was false and misleading when made because the Company's financial statements did not fairly present the Company's financial condition, because the carrying value of PP&E on the Company's balance sheet was massively inflated during the Relevant Period, and because the cost overruns in the Company's major contracts were caused by bribery and a bid rigging scheme and were therefore not "necessary to bring the asset to working condition." These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADRs. But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

117. Petrobras' financial statements also failed to report the contingent risks associated with the Company's unlawful activity. GAAP, in Accounting Standards Codification ("ASC") Topic 450, *Contingencies*, provides that disclosure of loss contingencies is required

when there is "at least a reasonable possibility [*i.e.*, a greater than slight chance] that a loss or an additional loss may have been incurred." ASC Topic 450 defines a contingency as an existing condition, situation, or set of circumstances involving an uncertainty as to possible gain or loss. IFRS, like GAAP, requires the disclosure of loss contingencies when the possibility of any outflow in settlement is greater than remote. *See, e.g.*, IAS 37, *Provisions, Contingent Liabilities and Contingent Assets.*

118.   Defendants knowingly or recklessly ignored that there was far more than a "remote possibility" that Petrobras would incur substantial fines and/or legal liability as a result of the illegal bid-rigging and kickback scheme. Nonetheless, Defendants, in violation of GAAP and IFRS, caused Petrobras to issue financial statements during the Relevant Period that failed to disclose such loss contingencies associated with the violation of Brazil's anti-corruption laws, including the Administrative Misconduct Law, which could subject Petrobras to massive contingent liabilities, including fines and legal liability. These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADRs. But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

119.   In addition, the overstatement of the Company's reported shareholders' equity materially distorted the Company's financial ratios, including its debt-to-equity and financial-leverage ratios. Financial ratios were material to Petrobras maintaining an investment grade rating and its ability to raise capital. During the Relevant Period, the Company represented, including in a presentation to investors dated March 15, 2013, that a key financial assumption for its investment grade rating was a leverage ratio lower than 35%. During the Relevant Period, Petrobras materially breached this important financial-leverage ratio. But for

39

these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

120.    Furthermore, the Forms 20-F Petrobras filed with the SEC during the Relevant Period failed to disclose, in accordance with Item 3 of Form 20-F, the "significant factors" that either had or could have had a material effect on the Company's operating results during the Relevant Period, including information regarding governmental, economic, fiscal, monetary, or political policies or factors that materially affected, or could materially affect, directly or indirectly, the Company's operations.  But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

> **B.    Defendants Made Materially False and Misleading Statements in Registration Statements and Prospectuses**

121.    On August 29, 2012, Petrobras, PifCo and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement incorporated by reference a number of documents, including (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011; and (2) the August 10, 2012 Form 6-K containing financial information for the six-month period ended June 30, 2011.  These documents contained material misstatements and omissions, as described above.

122.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, comprising $11 billion in six series of notes to be issued by PGF.  On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Form 6-K filed with the SEC on August 10, 2012, which contained financial information for the six-month periods ended June 30, 2012 and 2011.

Both of these documents contained material misstatements and omissions, as described above.

123.    On March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, comprising $8.5 billion in six series of notes to be issued by PGF.  On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo Form 20-F for 2012; and (2) the Petrobras Form 6-K filed with the SEC on February 26, 2014, which contained financial statements for the year ending December 31, 2013.  Both of those documents contained material misstatements and omissions, as described above.

### C.    Defendants Made Materially False and Misleading Statements in Investor Conference Calls

124.    In its conference call with investors concerning its 2009 full-year results, Defendants provided materially false and misleading explanations of the cost overruns with respect to its key refinery projects.  UBS analyst Lilyanna Yang asked why the Abreu refinery was expected to cost more than twice as much as refineries of similar complexity in the United States or Europe, and Defendant Gabrielli provided the false explanation that local infrastructure and environmental reasons were to blame for the overruns, when in reality they were caused by the bid rigging and kickback scheme:

> <Q - Lilyanna Yang, UBS>: . . . And secondly, and more on the refining CAPEX, I would like to understand why for instance the Abreu and Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the United States or Europe?  I might be missing something so I just wanted to understand if maybe it is related to infrastructure or something else, and maybe even the Maranhão and Ceará refineries seem to be a bit higher in terms of cost versus the international benchmark. So these are my two questions.  Thank you.
>
> <A - José Sergio Gabrielli de Azevedo>: . . . The second thing is on the refinery costs, we are finishing the numbers.  If you have the numbers, please tell me because we have not finished it, we do

41

not have them.

<Q - Lilyanna Yang, UBS>: We got the numbers from what the global press said and from what local reports from what the TCU indicates.

<A - José Sergio Gabrielli de Azevedo>: OK, if you have them, which is another thing. But we are finishing the numbers and for sure that is something that we have to take into consideration on a qualitative basis. For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in which you go, produce the refinery and plug to the infrastructure and this is it.

This is not our case. We have to develop part of the infrastructure within the project of the refinery. Power generation, power distribution, the utilization of residuals, transportation, some things that are necessary to build, the offsite of our refineries are bigger than the offsite of those international traditional companies.

These are important things to consider because the choice of a new refinery outside of the infrastructure existing today has several important reasons. One is the environmental reason. The other is the marketing type of decision, because our refineries that have been planned to be built are in the Northeastern of Brazil, North of Brazil, they have a market that we do not have enough capacity today for refining in those markets, and also they have a competitive advantage to be near, closer to the United States, the Central America and the European markets. And this means that we have to pay to consider this difference.

But, I am talking about the qualitative type of numbers, I do not have the quantitative right now to give you, because we are finishing our process. And all people that are around me here, they have told me that they have not finished the numbers. If you have them, I would like to know them.[1]

125. In its conference call with investors concerning its second quarter 2010 results, investors again asked about the high refinery costs, and management once again explained that despite technical challenges, the investments were very important. Remarkably in hindsight, Costa responded that Comperj was the Company's "most important expenditure."

---

[1] All underlining in quotations is for emphasis, unless otherwise noted.

&lt;Q - Arjun Murti&gt;: Thanks, Ted.  Just a follow-up question on the refining spending.  I think you mentioned you had started spending on the Abreu e Lima refinery.  What is the timing of developing a cost estimate and starting spending on – I think you call it Premium I and Premium II – the additional 900,000 barrels a day of refining capacity you'd mentioned in your business plan?  Thank you.

&lt;A - Paulo Roberto Costa&gt;: Yes.  We are spending a little bit high with that money in Abreu e Lima refinery.  That's because we are on the construction phase.  We are in this at the beginning.  And this is the main reason why we spend more money this year in comparison with the last year.

. . .

&lt;Q - Arjun Murti&gt;: I mean I guess, you have a five-year plan, which includes the building of Premium I and Premium II, and so I was wondering the cost estimates for the Abreu e Lima refinery are quite high, presumably the natural refinery in part benefit from that infrastructure, so really just curious when the timeframe would be when you can give a cost estimate for  the next round of refining spending, and when you plan on actually starting with that construction?

&lt;A - Theodore M. Helms, Investor Relations Executive Manager&gt;: Really, the Premium I or II are really happening, especially Premium I, really, Premium II is not really within the next five years.  And so what you'd say is that Premium I spending really only happens in starts beginning, assuming the project is approved in 2013, '014 and I think we're still, correct me if I'm wrong, Roberto, at a stage where saying, any – it's still in very development phase and saying anything about cost and prices would just be a pure guess.  We're just not even – haven't even – we're not close to being there yet.  Is that correct, Roberto?

&lt;A - Paulo Roberto Costa&gt;: Yes, that's right.

. . .

&lt;Q - Paul Cheng&gt;: Hey, guys.  Ted, the two refineries that are currently under construction, can you tell us again what is the cost estimate, and which one in the startup time, and see if there is any changes from previously what you disclosed?

&lt;A - Theodore M. Helms, Investor Relations Executive Manager&gt;:

Yes. Roberto, so cost estimate, I think we have in the past put out a number is that correct – publicly I think?

<Q - Paul Cheng>: Yes, one, I think they was talking about 12 billion, one is 9 billion. I just wanted to see if that had been changed?

<A - Theodore M. Helms, Investor Relations Executive Manager>: To the best of my recollection, and I might have read in the press – I don't know if we ever had an official number, but anyway, but I don't think we have any – we haven't made ourselves any disclosure or certainly any change or – to the start up. Do we have the dates, Roberto, these dates on startups of either Comperj or refineries in the Northeast?

<A - Paulo Roberto Costa>: We're expanding our investments. We're expanding our investment money mainly in conversion units inside of the existing refineries and quality, to improve the color quality, 83 millimeters, and to expand our capacity. Also, we have Northeast refinery. We have a Comperj also. And this is – we can say that this is our most important expenditure.

126.   In its conference call with investors concerning the Company's first quarter 2012 results, the Company once again failed to disclose the existence of the bribery scheme when asked about the costs of the projects, and even evaded answering simple questions concerning the total cost and ultimate timeline for the projects:

<Q - Paul Cheng>: How about the two already under construction, the Northeast refinery, the 230,000 barrel per day, and also Comperj, the 165,000 barrel per day? I think that previously you gave a budget of US$13 billion for the Northeast refinery and US$9 billion for the second one, supposed to come on stream in 2013 in both; I just want to see if there is any update on those.

<A - José Carlos Cosenza>: Well, for Northeast refinery and Comperj refinery, well, the numbers are above that, but we do not disclose those figures for each specific project.

<Q - Paul Cheng>: Can you tell us whether the number is higher or much higher now, or is it still roughly about the same? And whether that is still going to be on stream into 2013 or it is being delayed?

44

<A - José Carlos Cosenza>: They will be running on 2013 and 2014.

<Q - Paul Cheng>: <u>Because you did give budget on both previously</u>. So, I just wanted to see if that budget now is going to be much higher or is still roughly about the same.

<A - José Carlos Cosenza>: Around the same that was announced, the public numbers that you already have.

127.    Each of these statements concerning the reasons for the cost overruns at the Company's Abreu and Comperj refineries was materially false and misleading, because these statements failed to disclose that the true reason for the problems was a long-running bid rigging and kickback scheme. These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's securities. But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

128.    Defendants made other misrepresentations to investors, including Plaintiffs, in separate conference calls with investors. During the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Defendant Foster stated to analysts: "We have qualified personnel, we know how to work, and we know how to execute. Throughout our history we've invested billions of dollars in research and development, and we know what we're doing. Our reserves are absolutely real and legitimate." On May 9, 2014, in response to an interview question asking Defendant Foster to identify "the most important aspects of the company's governance," Foster stated that Petrobras "compl[ies] with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United States, the Latibex and Bolsa y Mercado Espafioles, Spain and the National Securities Commission (CNV) and the Buenos Aires Stock Exchange, Argentina."

129.   Defendant Foster's statements that the Company's reserves were "absolutely true and legitimate" and her statements attesting to Petrobras' compliance with the SEC's and NYSE's rules, including the SEC's requirement that all financial statements be accurately reported, were false and misleading for the reasons set forth above.  These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's securities.  But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

130.   On May 12, 2014, following reports that SBM had bribed Petrobras executives to secure a contract, Defendant Foster stated that the Company had "conducted investigations" and "there are no facts or a document that would document the payment of bribery to any employees of Petrobras.  The final report . . . was offered to the national authorities as not only executive and legislative, but also judicial authorities."  This representation was false because there was "overwhelming evidence" that SBM has paid bribes to Petrobras, as the Company would later be forced to admit to the investing public.

**D.      Petrobras Posted Materially False and Misleading Statements Online**

131.   On its website, the Company claimed during the Relevant Period that "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts."

132.   This statement was materially false and misleading because, in fact, its procurement processes were rigged and tainted by fraud and corruption.  Similarly, employee

46

functions were not segregated. This material misrepresentation was intended to induce investors, including Plaintiffs, to purchase the Company's ADRs. But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

133. The Company also claimed on its website during the Relevant Period that, with respect to third party suppliers, it "[carried] out integrity due diligence of our suppliers, joint venture partners and counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others: the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business."

134. This statement was materially false and misleading because, in fact, the Company's selection of contractors was rigged and tainted by fraud and corruption, and lacked "integrity" and "due diligence." This material misrepresentation was intended to induce investors, including Plaintiffs, to purchase the Company's securities. But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

135. The Company's "Facts and Data" blog was another source of many materially false and misleading statements and omissions.

136. On January 28, 2010, in response to newspaper articles reporting that Brazil's Audit Court, the TCU, had identified possible irregularities with respect to several of Petrobras' capital projects, the Company posted that "there have been no irregularities" in its contracts and that "[t]here are differences in the parameters used by TCU and Petrobras, resulting in different values in some of these works contracts." Petrobras further stated that "[t]he Company

47

systematically works with regulatory agencies and, where there are differences, tries to clarify

them - what has been done in the case of these four works." The very next day, on January 29,

2010, Petrobras further stated on its Facts and Data blog:

> [Petrobras] reaffirms that there has been no 'overbilling' or
> 'overpricing' in the [Abreu] works. The TCU uses National
> Department of Transportation Infrastructure (DNIT) criteria for
> road construction as a reference for contract analysis. Petrobras
> has already clarified innumerable times that those criteria do not
> apply to the ground leveling operations of a petroleum refinery, a
> much more complex work with specific conditions quite different
> from the characteristics of a highway. One of the great challenges
> for the construction of the [Abreu] refinery, in the ground leveling
> phase, was the type of soil of the region. Part of it is expansive,
> that is, with a great variation of volume and mobility. In addition
> to that the rainy season brought additional difficulties to the work.

137. On October 8, 2010, in response to TCU allegations, Petrobras posted that it

"reiterates that there are technical divergences between the methodologies adopted by the

company and by TCU. The criteria utilized by the Court are insufficient and do not apply to

works such as Comperj, much more complex with its own specificities. Petrobras collaborated

with TCU in all its requests and there was no obstruction at any time."

138. On November 9, 2010, in response to TCU allegations that the Abreu refinery

contracts were overpriced, Petrobras posted a statement on its Facts and Data website stating:

> Petrobras denies that there were irregularities in the construction
> works of the Presidente Getulio Vargas (Repar) and Abreu e Lima
> (Rnest) refineries. . . . The criteria utilized by the TCU are not
> applicable to works such as a petroleum refinery, more complex
> and with their own specificities. . . . In the preparation of its call to
> bids, Petrobras rigorously observes the terms of Decree No.
> 2,745/98, which deals with Simplified Bidding Procedure and
> which endows the Company flexibility to develop its projects with
> efficiency, economy, and profitability. Petrobras reiterates that the
> criteria of acceptability of prices questioned by the Court are
> aligned with national and international technical standards in
> regard to the subject. In addition, in the formation of prices, the
> Company also considers aspects related to safety items, the

48

environment, health, and social responsibility.  These requirements produce important results, such as a low on-the-job accident index.

139.    On November 8, 2011, Petrobras posted on Facts and Data the following:

Petrobras clarifies that there has not been an overbilling, overpricing, or any other irregularity in its works. . . .  A refinery is an enterprise of great complexity and with its own specificities. Such works present a series of practical differences, such as logistics, the qualification of labor, geographic localization, contract guarantees, among other things.

140.    On August 5, 2012, in response to an article issued by the Brazilian publication *O Estado de S. Paulo* reporting that TCU had identified irregularities with respect to approximately $500 million in contracts related to Abreu, Petrobras stated on Facts and Data that it "does not recognize any of the signs of irregularities identified by the Court (TCU). . . . . These so-called irregularities found by the Court (TCU) are based mainly in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works." The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."

141.    On December 29, 2012, Petrobras posted to Facts and Data that:

[Petrobras] denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests. . . .  Petrobras has its accounts analyzed in a permanent and continuous manner by internal and external auditors under the auspices of the Comptroller General of the Union (CGU) and the Court of Accounts of the Union (TCU).  The Company complies with the requirements of such agencies as the Securities Values Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbanes-Oxley Act, having had all its balances audited and approved in all instances. In 2012, for the 12th consecutive year, Petrobras was honored with the Transparency Trophy awarded by [Brazilian finance and accounting associations].

142.    On January 7, 2013, in response to questions concerning potential overpricing,

49

Petrobras stated on Facts and Data:

> Petrobras reaffirms that there are no irregularities in the
> construction of the Abreu e Lima Refinery in Pernambuco. The
> reporting in *Fantastico* improperly compares the values of the
> basic refinery project, prepared seven years ago, with what is being
> constructed. The initial project underwent various modifications
> due to of changes in the scenario. The Company also reaffirms
> that there are no irregularities in the Rio de Janeiro Petrochemical
> Complex works. Petrobras has clarified all questions put forth by
> the [TCU] and reaffirms that as of this point in time no definitive
> judgment has noted any irregularity whatsoever.

143.    On May 19, 2014, Petrobras made the following statement on its Facts and Data

website concerning the Abreu refinery: "Petrobras restates that there is no 'overcharging of

R$69.9 million' in the contract with the consortium Abreu e Lima. Since 2008, the company

has been telling the TCU that there are methodological divergences in accounting for items that

are specific to the oil industry. The court itself has revised the values, after the clarification, for

R$19 million. The company is still communicating with the TCU to demonstrate that there is no

overpricing or overbilling in the works." The Company issued virtually identical statements on

Facts and Data again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23,

2014, and July 14, 2014.

144.    On July 23, 2014, Petrobras stated on the Facts and Data blog: "Regarding the

matter 'TCU points to irregularities,' Petrobras reaffirms that there is no overbilling in its

works." Petrobras went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras

reaffirms that there is no overbilling or overpricing."

145.    Each of the statements made on the Facts and Data blog listed above were

materially false and misleading because, in fact, a significant number of the contracts Petrobras

entered into in connection with Abreu, Comperj, and other projects were subject to overbilling

and overpricing as a result of the scheme, which inflated many of the Abreu contracts, and the

50

"mandatory" kickbacks to Company executives and their political sponsors.

146.   The cost overruns and delays associated with Abreu and Comperj were not caused, as Petrobras claimed, by project complexities, technical challenges, environmental issues, soil problems, logistical challenges, project modifications, labor issues, or any other non-fraud explanation identified in the blog posts.  Instead, they were caused by a long-running and systematic bid rigging and kickback scheme.

147.   The material misstatements and omissions in the Facts and Data blog were intended to induce investors, including Plaintiffs, to purchase the Company's securities.  But for these material misrepresentations by Defendants, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.

### E.   Defendants Made Materially False and Misleading Statements Concerning the Company's Internal Controls

148.   Throughout the Relevant Period, Defendants and former CEOs Foster and Gabrielli and CFO Barbassa certified the effectiveness of the Company's internal controls and procedures.  Specifically, each of the Company's Forms 20-F included a certification signed by Barbassa, as well as Gabrielli (for the 2009 and 2010 Forms 20-F) and Foster (for the 2011, 2012, and 2013 Forms 20-F), stating:

> The Company's other certifying officer and I . . . have: (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; . . .  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

149.    Additionally, the February 29, 2012 Form 6-K, the 2010 Form 20-F, and the

2011 Form 20-F contained the following statement:

> [M]anagement assessed the effectiveness of [the] Company's internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on that assessment, management has concluded that as of December 31 [of the reporting year,] [the] Company's <u>internal control over financial reporting is effective</u>.

150.    The 2012 Form 20-F, the 2013 Form 20-F, and the March 7, 2014 Form 6-K filed

with the SEC contained the following representation:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control-Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on such assessment and criteria, the Company's management has concluded that Company's <u>internal control over financial reporting was effective</u> as of December 31 [of the reporting year].

151.    Between March and August 2014, as Operation Car Wash began to unfold,

Petrobras and Defendants Foster and Costa denied any participation in or knowledge of the

bribery scheme, stating repeatedly that there were "no facts or documents that evidence the

payment of bribes to Petrobras employees," that Costa's "involvement in money laundering and

remittance abroad is zero," that "you will not find anything illegal at Petrobras, because there is

nothing illegal about Petrobras," that "there is no indication of irregularities" at Abreu and

"there is no overpricing or overbilling in the project of the Abreu e Lima refinery."

152.    Each of the statements set forth above was materially false and misleading for the following reasons: As described in detail herein, Petrobras' internal controls were grossly ineffective and were routinely overridden during the Relevant Period.  Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives.

153.    Defendant Foster has since admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls."

154.    The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Defendants Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that . . . were overbilled," yet no action was taken by the Company to discontinue the fraudulent scheme.

### F.    Defendants Made Materially False and Misleading Statements Concerning Compliance With By-Laws and Code of Ethics

#### 1.    Petrobras' By-Laws

155.    During the Relevant Period, Petrobras included its By-Laws on its website. Article 3 sets the Company's corporate purpose as "the research, mining, refining, processing, trade and transport of oil from wells, shale and other rocks, its derivatives, natural gas and other fluid hydrocarbons, in addition to other energy related activities."  Paragraph 1 of Article 3 explicitly prohibits the Company from engaging in activities related to this purpose in any manner other than those dictated by free and fair market conditions:

> Economic activities related to the corporate object shall be

53

developed by the Corporation on a <u>free competition basis</u> with other companies according to market conditions, due consideration given to further principles and guidelines of Law n° 9,478 of 6 August 1997 and of Law n° 10,438 of 26 April 2002.

156.    During the Relevant Period, Defendants acted contrary to this provision and the By-Laws by engaging in and failing to prevent a massive kickback scheme that funneled at least hundreds of millions of dollars to insiders and their affiliates through the artificial inflation of Petrobras' supply contracts, the prices of which were not set by prevailing market conditions but were designed to further the scheme and enrich its participants.

### 2.    Petrobras' Code of Ethics

157.    In 1998, Petrobras' Board of Executive Directors approved the Code of Ethics. In 2002, the Code of Ethics was renamed the System Code of Ethics.  In 2006, Petrobras' board of executive officers and the Board approved the current version of the Code of Ethics, after undergoing a revision process with wide participation from Petrobras' business segments, employees, and subsidiaries.

158.    Petrobras' Code of Ethics extends to all of its subsidiaries and applies to its Board, executive officers, senior management, employees, interns, and service providers.  As represented by Petrobras in its April 30, 2014 Form 20-F for the year ended December 31, 2013 (the "2013 Form 20-F"), which was signed by Defendants Foster and Barbassa, no waivers of the provisions of the Code of Ethics or the Code of Good Practices are permitted.

159.    During the Relevant Period, the Code of Ethics was disclosed on Petrobras' website and stated:

> This Ethics Code covers the members of Boards of Directors, Fiscal Councils, Executive Boards, the occupants of managerial functions, employees, trainees and service providers of Petrobras system, as individual and collective commitment of each and all of them to comply with it and promote its compliance in all actions of

54

the productive chain of Petrobras System and in its relations with all interested parties.

160.    In 2008, Petrobras' executive officers created the Petrobras Ethics Commission, which has been responsible for promoting corporate compliance with ethical principles and acting as a forum for discussing ethics subjects.

161.    During the Relevant Period, the Code of Ethics stated in part:

> Respect for life and all human beings, integrity, truth, honesty, justice, equity, institutional loyalty, responsibility, zeal, merit, transparency, legality, impersonality, coherence between speech and practice, are the ethics principles that guide the actions of Petrobras System.
>
> * * *
>
> Petrobras System recognizes and respects the legal, social, and cultural aspects of the various environments, regions, and countries in which it operates, always adopting the criterion of maximum execution of rights, compliance with law, rules, and internal procedures.

162.    The Code of Ethics also discussed corporate governance practices and stated in part:

> 1.2 conduct its business with transparency and integrity, creating credibility with its shareholders, investors, employees, suppliers, customers, consumers, government, media, communities where it operates and society in general, pursuing to achieve growth and profitability with social and environmental responsibility;
>
> * * *
>
> 1.5 promote honest and fair negotiations, without receiving inappropriate advantage through manipulation, use of insider information and other practices of such nature; [and]
>
> 1.6 register its reports and statements in a correct, consistent, accurate and complete way, without ambiguous information and make its ledgers available with full transparency to internal and external audits and relevant public agencies[.]

163.    The Code of Ethics discussed employee practices and stated in part:

> 3.12 do not require nor imply, neither accept nor offer any favor, advantage, benefit, gift, gratuity, for themselves or any other person, in return to their professional activities, and they may accept or offer just promotional, public, not exclusive, without commercial value gifts in their relationships with groups out of System[.]

164.    The Code of Ethics discussed relations with suppliers, service providers, and trainees and stated in part:

> 4.2 require to the service providers that their employees comply with the ethics principles and commitments defined in this Code, while contracts with System companies are in force; [and]
>
> 4.3 select and hire suppliers and service providers based on criteria strictly legal and technical of quality, cost and timeliness, and demand an ethics profile in their management and social and environmental responsibility practices, refusing unfair competition, child labor, forced or compulsory labor practices, and other practices contrary to the principles of this Code, including the production chain of such suppliers[.]

165.    The Code of Ethics discussed relations with society, government, and the state, and stated in part:

> 8.8 refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions; [and]
>
> 8.9 refuse support and contributions to political parties or political campaigns of candidates for elective offices[.]

166.    As alleged herein, unbeknownst to Plaintiffs, Defendants systematically violated Petrobras' Code of Ethics throughout the Relevant Period by engaging in a massive kickback scheme, but failed to disclose these material facts to investors. To the contrary, Defendants repeatedly and falsely represented that Petrobras was acting in compliance with the Company's Code of Ethics and applicable laws and regulations.

## VIII.   DEFENDANTS' SCHEME HAS BEEN INCREMENTALLY REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES

167.   Details of the Petrobras scheme emerged starting in September 2014, and they continued to be revealed through the end of the Relevant Period.  Defendants did not admit to the fraud until January 28, 2015, but the early disclosures beginning in September 2014 nonetheless caused financial losses as a result of the fraud.  Certain documents were destroyed by Petrobras, but Plaintiffs nonetheless anticipate that additional information concerning the fraud will become available through discovery in this action.

### A.   The Press Begins To Unveil Defendants' Fraud

168.   Information about the kickback scheme and the fraud began to be publicly revealed in early September 2014, but the true scope of the fraud and the nature of Defendants' misrepresentations took longer to come to light.  In September 2014, the media reported that former Petrobras executive Costa (who had been arrested back in March 2014) had confessed to his participation in, and had provided information about, the Petrobras kickback scheme in a plea bargain for a reduced sentence.

169.   On Saturday, September 6, 2014, the Brazilian magazine *Veja* published an article describing allegations of a widespread kickback scheme at Petrobras.  On September 7, 2014, the *Anadolu Agency* published an article entitled "Dozens of Brazilian politicians named in corruption scandal," which described the *Veja* article.

170.   On September 8, 2014, the Company issued a press release discussing the kickback allegations by Costa, stating, in pertinent part, as follows:

> 1. It is inappropriate to comment on non-official information published by media outlets.  It is also inappropriate to comment on ongoing investigations or on the declarations of individuals or companies under investigation by the Federal Police or by any other authorities.

2. Regarding its projects and businesses, Petrobras has continued to provide information to the public via its website www.petrobras.com.br, Press Releases, responses to media outlets and announcing any Material Facts. This ensures transparency in all matters relating to the cases that are under analysis or under investigation.

3. Furthermore, Petrobras fully complies with its obligations and has been providing all information requested by the Federal Police-PF, Federal Audit Court-TCU, Office of the Federal Controller General-CGU and the Public Prosecutor's Office- MP. In addition, the company always notifies these entities of new facts and information that come to its attention.

4. Petrobras' management is interested in seeing the conclusion of all ongoing investigations by all such entities. The company will continue to contribute swiftly and effectively for this to happen. In this regard, Petrobras has requested to the judge responsible for the "Lava Jato" operation to gain access to the information pertaining to Petrobras that has been provided by Mr. Paulo Roberto Costa within the scope of his whistleblower status. In addition, the company has sent letters to the companies cited by the media outlets requesting information regarding the existence of its contracts with the companies connected to Mr. Alberto Youssef and on any involvement with the activities object of this investigation. This information will aid the work of the Internal Investigative Commissions that have been set-up.

5. Lastly, the Executive Board announces to its shareholders and employees that the company continues to operate normally across all of its units to meet its business objectives. The illegal activities, which may have been committed by an individual or by a group of individuals, employed or not by the company, do not represent the conduct of the Petrobras institution or of its workforce consisting of thousands of employees.

171.    In response to the reported allegations about the Petrobras kickback scheme, the

price of Petrobras Common ADRs declined from $19.38 on September 5, 2014, prior to the

reporting of the allegations, to $18.35 per ADR (an over 5% decline) on September 8, 2014, on

extremely heavy trading volume. The price of Petrobras Preferred ADRs declined from $20.27

on September 5, 2014, prior to the reporting of the allegations, to $19.24 per ADR (an

approximately 5% decline) on September 8, 2014. Petrobras bonds listed on the NYSE also fell following the news.

172.    On September 8, 2014, *TheStreet.com* published an article entitled "Why Petroleo Brasiliero Petrobras (PBR) Stock Is Declining Today," which discussed Costa's testimony about the kickback scheme.

173.    The price of Petrobras Common ADRs continued to decline over the next several days, closing at $17.83 per ADR on September 9, 2014 and $17.38 per ADR on September 10, 2014, down $2 per ADR, or 10.32%, from the closing price on September 5, 2014. The price of Petrobras Preferred ADRs declined to $18.71 per ADR on September 9, 2014 and $18.26 per ADR on September 10, 2014, down $2.01 per ADR, or 9.92%, from the closing price on September 5, 2014. Petrobras bonds listed on the NYSE also continued to fall.

174.    On September 12, 2014, it was reported that Brazilian construction companies cited in the money-laundering probe were listed among the main contributors to President Rousseff's re-election campaign. The three companies, OAS SA, Andrade Gutierrez SA, and UTC Engenharia SA, had donated a combined $15.7 million to the campaign, according to those reports.

175.    In response to the implication of Petrobras' major contractors in the bribery scheme, Petrobras Common ADRs fell approximately 7.1%, from $17.63 on September 11, 2014, to $16.38 on Friday, September 12, 2014. Petrobras Preferred ADRs fell approximately 7.2%, from $18.55 to $17.21. Petrobras bonds listed on the NYSE also fell following this news.

176.    After the markets closed on September 30, 2014, *Bloomberg* reported that the scope of the bribery scheme may have been broader than Costa's Downstream Division. *Bloomberg* reported that "misappropriation of funds also existed in other divisions including the

one Duque headed [i.e. services]." The article also noted that Duque had approved approximately $2.7 billion in contracts for the Abreu refinery. On October 1, 2014, before the market closed, it was reported that Brazilian police were probing links between Youssef and Petrobras.

177. In response to reports of the widening scope of the bribery scandal, Petrobras Common ADRs fell approximately 6%, from $14.19 on September 30, 2014, to $13.30 on October 1, 2014, and Petrobras Preferred ADRs declined approximately 7%, from $14.89 to $13.84 on October 1, 2014. Petrobras bonds listed on the NYSE also fell following this news.

178. On October 9, 2014, recordings of Costa's testimony describing the Petrobras kickback scheme were released online by a Brazilian federal court. An October 9, 2014 article in *The Wall Street Journal*, entitled "Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials; Brazilian Court Releases Taped Testimony Claiming Bribes Paid to President Rousseff's Allies," stated, in pertinent part, that Costa testified that it was common in Petrobras divisions to pay kickbacks to members of Rousseff's Workers' Party.

179. On October 15, 2014, various news articles confirmed that the Administrative Council for Economic Defense ("CADE"), a Brazilian federal anti-corruption agency, had opened a probe into the bribery scandal.

180. In response to the news of the CADE anti-corruption probe into Petrobras, Petrobras Common ADRs fell approximately 9%, from $17.10 on October 14, 2014 to $15.55 on October 15, 2015. Petrobras Preferred ADRs fell approximately 8.7%, from $18.09 to $16.51. Petrobras bonds listed on the NYSE also fell following this news.

181. On October 16, 2014, various news articles reported that TCU, the Brazilian audit court, criticized the construction of the Comperj refinery, and identified inflated contracts

and other wasteful spending.  In particular, it was reported that TCU found that Petrobras had been "reckless," that there were irregularities, a lack of effective controls, and inflated contracts. At least three contracts were identified in particular: two that were overpaid and one that was signed in an "emergency" time-frame that didn't allow other companies to bid.  The TCU report was widely covered in the press.

182.   In response to the TCU audit report, Petrobras Common ADRs fell approximately 6.8%, from $15.55 on October 15, 2015, to $14.50 on October 16, 2015. Petrobras Preferred ADRs fell approximately 7.9%, from $16.51 to $15.21.  Petrobras bonds listed on the NYSE also fell following this news.

183.   On Saturday, October 18, 2014, President Rousseff admitted for the first time during a news conference that evidence existed that money was illegally diverted from Petrobras, and that the Company would seek reimbursement of any money illegally diverted. This statement was widely covered over the weekend in the press.

184.   In response to President Rousseff's interview, Petrobras Common ADRs fell approximately 6.2%, from $14.93 on October 17, 2014, to $14.00 on Monday, October 20, 2014.  Petrobras Preferred ADRs fell approximately 6.9%, from $15.65 to $14.57.  Petrobras bonds listed on the NYSE also fell following this news.

185.   On October 20, 2014, *TheStreet.com* reported, in an article entitled "Why Petrobras (PBR) Stock is Down Today," that Rousseff acknowledged that there was evidence money was illegally diverted from Petrobras.

186.   After the market closed on October 20, 2014, *Bloomberg* published a detailed article entitled "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," which explored how Costa—the "human bomb"—and others had siphoned kickbacks from companies to whom

Petrobras awarded inflated contracts, and that Costa himself had admitted to receiving tens of millions in bribes. Among other things, the article noted that "court documents released by a judge presiding over the case in Brazil's Parana state assert that on the day federal cops went to roust Costa from his Rio home, seeking a key to his locked office, a security camera caught his two daughters and their husbands in that very office stuffing suitcases and bags with cash, incriminating documents and a laptop, all of which they hoped to hide from the police."

187. The article also reported that federal police raiding Costa's Rio de Janeiro house had found about $500,000 in cash, a mix of dollars, Euros and Brazilian reais, and that Swiss court documents indicated that $28.5 million had been stashed in secret Swiss bank accounts, including $5 million in accounts for Costa's relatives. The article also noted that under Costa's deal with prosecutors, as revealed by Brazilian federal court documents, Costa had agreed to turn over to the government all the Swiss cash and surrender other assets including a $440,000 yacht, $1.3 million worth of land, and a Land Rover.

188. The article went on to describe how the audio tapes from Costa's interview indicated that members of the ruling-party coalition had introduced Costa to Youssef, the admitted money launderer whom authorities accused of setting up fake import companies to launder the kickbacks. According to the article, a police investigation into Youssef, who served time in a Brazilian prison for his role in a major money-laundering operation in Latin America, led to the discovery of Costa's involvement. Authorities were looking into suspicions that Youssef had returned to his old occupation, only to stumble upon the fact that Costa was one of his major clients, the article explained. When Youssef was arrested for money laundering on March 17, he had seven mobile phones in his possession, and police found 27 others at his office—one for each of his clients—*Bloomberg* reported.

189.    In response to this article, Petrobras Common ADRs fell approximately 5.7%, from $14.00 on Monday, October 20, 2014, to $13.20 on October 21, 2014.  Petrobras Preferred ADRs fell approximately 6.7%, from $14.57 to $13.59.  Petrobras bonds listed on the NYSE also fell following this news.

190.    After the market closed on October 22, 2014, it was announced that the CVM had opened an investigation into the kickback scheme.  The CVM announced the "administrative procedure" on its website without providing details.  The CVM was looking into corruption allegations at Petrobras related to the money-laundering case known as Operation Car Wash, as *Epoca* Magazine had earlier reported on its website on October 21.  The CVM announcement was widely covered in the press.

191.    An article by the *Associated Press* released on October 24, 2014—after the close of trading—entitled "Brazil's Rousseff Slams Magazine's Allegations," stated, in pertinent part, that Youssef testified that he helped launder Petrobras kickbacks and that Rousseff and other executive branch members knew about the scheme.

192.    On October 27, 2014, Petrobras acknowledged for the first time, in a Form 6-K, that it had hired two "independent investigation companies," later revealed to be two law firms—Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP—to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business."  The Company also announced, for the first time, that these investigations "will also analyze correlated facts and circumstances that might have material impact over the Company's business."

193.    In response, Petrobras Common ADRs fell 13.7%, from $12.93 on October 24,

2014, to $11.16 on October 27, 2014, and Petrobras Preferred ADRs fell 14.6%, from $13.46 to

$11.49. Petrobras bonds listed on the NYSE also fell following this news.

194.   In response to revelations referenced above, the price of Petrobras Common

ADRs declined from $16.77 per ADR on October 9, 2014, to $11.16 per ADR (a 33.45%

decline) on October 27, 2014, on extremely heavy trading volume. The price of Petrobras

Preferred ADRs declined from $17.77 per ADR on October 9, 2014, to $11.49 per ADR (a

35.34% decline) on October 27, 2014. Petrobras bonds listed on the NYSE also fell in response

to the revelations referenced above.

195.   On November 1, 2014, Brazilian articles reported that PwC had refused to sign

off on Petrobras' third-quarter 2014 financial statements. In particular, it was reported that PwC

had refused to sign off on the financial results for Petrobras' transport subsidiary known as

Transperto, which were signed by Sergio Machado. Costa had said in videotaped testimony that

he had received 500,000 reais ($202,000) from Machado. On November 3, 2014, Petrobras

announced that Machado had stated he would take one month of unpaid leave.

196.   On this news, Petrobras Common ADRs fell approximately 3.8%, from $11.70

on October 31, 2014, to $11.26 on November 3, 2014. Likewise, Petrobras Preferred ADRs fell

approximately 4.6%, from $12.23 on October 31, 2014, to $11.67 on November 3, 2014.

Petrobras bonds listed on the NYSE also fell following this news.

197.   On November 9, 2014, the *Financial Times* published a detailed article entitled,

"US Turns Up Heat With Criminal Investigation Into Petrobras," which reported that the U.S.

Department of Justice and SEC had opened criminal and civil investigations into Petrobras.

198.   In response, Petrobras Common ADRs fell approximately 2.6%, from $10.90 on

November 7, 2014, to $10.62 on November 10, 2014. Petrobras Preferred ADRs also fell

approximately 2%, from $11.27 on November 7, 2014, to $11.04 on November 10, 2014.

Petrobras bonds listed on the NYSE also fell following this news.

> **B.      Petrobras Delays Its Financial Statements And Admits That The Kickback Scheme Reported in the Press Would Render Its Prior Statements Materially False**

199.    On November 13, 2014, the Company issued a press release announcing that it would not file its third quarter 2014 financial statements as scheduled.  The press release stated, in pertinent part:

> As has become known publicly, Petrobras is undergoing a unique moment in its history, in light of the accusations and investigations of the *"Lava Jato Operation"* being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime against the company's former Downstream Director, Paulo Roberto Costa.  The former director is currently under investigation for corruption and embezzlement, among other offenses.

> Faced with these circumstances, and considering the declarations of the former Downstream Director in a federal court on October 8, 2014 that, if found to be true, could potentially affect the company's financial statements, Petrobras has taken numerous steps aimed at furthering related investigations.

> Within this context, on October 24 and 25, 2014 Petrobras hired two independent law firms specialized in conducting investigations - Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP -to examine the nature, extent and impact of the acts that may have been committed within the context of the allegations made by former Downstream Director Paulo Roberto Costa, as well as to investigate related facts and circumstances that have a significant impact on the company's business operations.  Hiring these independent firms was recommended by the Audit Committee of the Board of Directors in compliance with the best international practices and authorized by the Executive Board.

> However, as a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements

> based on the accusations and investigations related to the "Lava Jato Operation" and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.
>
> As a result, and in recognition of the importance of transparency, Petrobras expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014, reflecting its balance sheet based on facts that are known as of that date.
>
> Petrobras is committed to releasing its third quarter 2014 results duly reviewed by its Independent Auditors as soon as possible.

200.    In response, Petrobras Common ADRs fell 3.4% on November 13, 2014, from $10.56 on November 12, 2014, to $10.20 on November 13, 2014.  Petrobras Preferred ADRs fell 4.2%, from $10.98 to $10.52.  Petrobras bonds listed on the NYSE also fell following this news.

201.    On November 14, 2014, *The Wall Street Journal* published an article entitled "Petrobras Scandal Widens, Earnings Delayed," which stated, in pertinent part, that Brazilian federal police served dozens of search warrants and raided the offices of 11 companies and arrested 18 people suspected of participating in the kickback scheme, including Duque.

202.    In response, Petrobras Common ADRs fell 2.5%, from $10.20 on November 13, 2014, to $9.95 on November 14, 2014.  Likewise, Petrobras Preferred ADRs fell 2.8%, from $10.52 on November 13, 2014, to $10.23 on November 14, 2014.  Petrobras bonds listed on the NYSE also fell following this news.

203.    On November 17, 2014, before the market opened, Petrobras held a conference call with analysts and investors to discuss the Company's intention not to file its third quarter 2014 financial statements as scheduled.  During the conference call, Defendant Foster stated that "Petrobras is not able to publish its 3Q14 financial statements.  Because these accusations, if

found to be true, could potentially affect the Company's financial statements." During the conference call, an analyst asked about the potential impact on the Company's financial statements if the allegations of the kickback scheme are confirmed. Defendant Barbassa responded that adjustments would be made to the fair price of the Company's PP&E that was acquired, so that any overpayment "should be removed from PP&E line item, [adjusted] value, and should be taken to the result." In determining a fair value, Barbassa elaborated that Petrobras would need to deduct from PP&E "any amount that could be linked to bribery of any sort, any excessive price that would have been charged."

204.    In response to the revelations referenced above, the price of Petrobras Common ADRs declined from $9.95 per ADR on November 14, 2014, to $9.33 per ADR (a 6.23% decline) on November 17, 2014, on extremely heavy trading volume. The price of Petrobras Preferred ADRs declined from $10.23 per ADR on November 14, 2014, to $9.64 per ADR (a 5.77% decline) on November 17, 2014. Petrobras bonds listed on the NYSE also fell in response to the revelations referenced above. Because the full extent of Defendants' fraud had not been revealed, Petrobras Securities continued to remain artificially inflated.

205.    On November 24, 2014, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC, stating, in pertinent part:

> Petrobras hereby informs that on November 21 it received a subpoena from the U.S. Securities and Exchange Commission ("SEC") requesting certain documents relating to the SEC's investigation of the Company.
>
> The subpoena requires the production of certain documents that will be gathered with the assistance of Trench, Rossi e Watanabe Advogados and Gibson, Dunn & Crutcher, the Brazilian and U.S. law firms previously retained by Petrobras to conduct an independent internal investigation.
>
> Petrobras reiterates its commitment to cooperate with the U.S. authorities with the same dedication that it has been cooperating

with the authorities in Brazil.

206.   In response, Petrobras Common ADRs fell 3%, from $10.84 on November 21, 2014, to $10.50 on November 24, 2014.  Likewise, Petrobras Preferred ADRs fell 3%, from $11.44 to $11.06.  Petrobras bonds listed on the NYSE also fell following this news.

207.   On November 27, 2014, *Bloomberg* published an article entitled "Petrobras Texas Refinery Probe Recommends Staff Penalties."  The article reported that the Company's internal investigation into its Pasadena, Texas refinery recommended penalties for a group of employees.  Reports on the Abreu and Comperj refineries, where costs exceeded the state-run oil producer's original estimates, would be presented at a December 12 board meeting, *Bloomberg* also reported.

208.   In response, Petrobras Common ADRs fell 8%, from $10.60 on November 26, 2014, to $9.72 on November 28, 2014.  Likewise, Petrobras Preferred ADRs fell 8.9%, from $11.21 on November 26, 2014, to $10.21 on November 28, 2014.  Petrobras bonds listed on the NYSE also fell following this news.

209.   On December 12, 2014, the Company issued a press release announcing that it would not file its consolidated interim financial statements for the third quarter of 2014 as scheduled, stating, in pertinent part:

> Petrobras announces that today, in light of new facts that occurred after November 13, 2014, directly or indirectly related to the "Lava Jato Operation," it decided not to file its consolidated interim financial statements for the 3rd quarter 2014 not reviewed by the independent auditors.  These facts are set out below:
>
> (i)      Obtained a waiver for its earliest financial reporting covenants that allows the Company to release its interim financial statements for the 3rd quarter 2014 by January 31, 2015, with no risk of acceleration of its finance debt by its creditors;
>
> (ii)     On November 21, 2014, Petrobras received a subpoena from the U.S. Securities and Exchange Commission (SEC)

requesting certain documents relating to an investigation of the Company by the SEC;

(iii)   On December 3, 2014, Petrobras gained access to the depositions of Mr. Julio Gerin de Almeida Camargo (Grupo Toyo) and Mr. Augusto Ribeiro de Mendonça Neto (Grupo Setal) given as state's evidence to prosecutors;

(iv)   On December 9, 2014, the Company was served with a class-action complaint filed by Mr. Peter Kaltman before the U.S. Court (United States District Court, Southern District of New York). We expect additional complaints to be filed, which could potentially be consolidated with Kaltman's complaint;

(v)   On November 11, 2014, criminal charges were filed by the Brazilian Public Prosecutor's Office against several individuals, including the Former Director of Downstream, Paulo Roberto Costa, and managers of other companies for active corruption, passive corruption, organized crime, money-laundering and falsification of documents.

210.   As a result, Petrobras Common ADRs fell approximately 19%, from $7.75 on December 10, 2014, to $6.26 on December 15, 2014. Petrobras Preferred ADRs fell approximately 20%, from $8.31 on December 10, 2014, to $6.66 on December 15, 2014. Petrobras bonds listed on the NYSE also fell following this news.

211.   On January 2, 2015, Brazil's securities regulator announced that it had opened an investigation into the Company. *Bloomberg* reported that Petrobras' value "decline[d] as officials opened an inquiry into management at the oil producer, which is at the center of the biggest corruption investigation in the country's history." The article also noted that Petrobras said that it was banning 23 contractors, including Brazil's top builders, from taking part in bidding.

212.   On this news, Petrobras Common ADRs fell 7.4%, from $7.30 on December 31, 2014, to $6.76 on January 2, 2015. Petrobras Preferred ADRs fell 8%, from $7.58 on December 31, 2014, to $6.95 on January 2, 2015. Petrobras bonds listed on the NYSE also fell following

this news.

### C.     Petrobras Admits the Kickback Scheme and Concedes Overstatement of Its Assets, But Does Not Correct Prior Financial Statements

213.     On January 28, 2015, Petrobras filed the 3Q14 Form 6-K with the SEC and

reported its financial results for the third quarter of 2014.  The 3Q14 Form 6-K discussed the

kickback scheme and acknowledged that the Company's PP&E assets had been overstated, but

failed to quantify the overstatement or the impairment charge that was necessary.  The 3Q14

Form 6-K stated, in pertinent part, as follows:

> On November 13th, 2014 as a result of the facts and proofs obtained in the "Operation Lava Jato" Petrobras decided to postpone the release of its third quarter 2014 financial results.  In short, the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.

> Consequently we have concluded that it is impracticable to correctly quantify these improperly recognized values, since the payments were made by external suppliers and cannot be traced back to the company's accounting records.

> *  *  *

> The appraised assets represent R$ 188.4 billion, or approximately 1/3 of the company's total fixed assets (R$ 597.4 billion) and were based on contracts signed between Petrobras and the companies mentioned in "Operation Lava Jato" from 2004 to April 2012.

> *  *  *

> The outcome of the appraisals indicated that the assets with fair value below the book value would total R$ 88.6 billion of lower difference.  The assets with higher fair value totaled R$ 27.2 billion of higher difference than the book value.

> So, we have decided not to use the methodology of determining the fair value as a "proxy" to adjust the company's fixed assets due to fraud and corruption, because this adjustment would include

elements with no direct relation with the unlawful payments. We are going to further examine another methodology that takes into account values, deadlines and information from the "Operation Lava Jato" testimonials, in compliance with the requirements of the regulators (CVM and SEC), aimed at releasing the financial statements reviewed.

214. Petrobras admitted in the 3Q14 Form 6-K that its reported PP&E assets were artificially inflated as a result of the unlawful activities of its senior managers, stating, in part, that the "Company believes it is necessary to correct the amounts related to the misconduct that were capitalized." The 3Q14 Form 6-K also discussed various methodologies purportedly used by the Company to calculate the amount of the impairment, but stated that those methodologies were not accepted and that further investigation and analysis was warranted.

215. Petrobras acknowledged internal control weaknesses by implementing new policies and procedures in a purported attempt to prevent future schemes of a similar nature. As set forth in the 3Q14 Form 6-K, Petrobras instituted the following measures, among others, purportedly "to improve corporate governance and internal controls":

> On November 25, 2014 the Board of Directors approved the creation of the position of Executive Director of Governance, Risk and Compliance, with the aim of supporting the Company's compliance programs and mitigating risks in its activities, including fraud and corruption. The Executive Director of Governance, Risk and Compliance will participate in the decisions of the Executive Board, and any subjects submitted to the Executive Board for approval must previously be approved by this Director as they relate to governance, risk and compliance.

> On January 13, 2015 the Board of Directors approved the appointment of Mr. Joao Adalberto Elek Junior to the position of Executive Director of Governance, Risk and Compliance from a list of three professionals, previously selected by an executive recruitment and placement firm, Korn Ferry. Mr. João Adalberto Elek Junior took office on January 19, 2015. The Executive Director will serve a three-year term, which may be renewable, and will only be removed if determined by the Board of Directors, with quorum including the vote of at least one Board Member elected

71

> by the minority or by the preferred shareholders[.]

> The Company has formed a Special Committee that will act independently and will have a direct reporting line to the Board of Directors, and report on the independent internal investigation being conducted by the two law firms, Gibson, Dunn & Crutcher LLP and Brazilian firm Trench, Rossi e Watanabe Advogados. The Special Committee will be composed of Mrs. Ellen Gracie Northfleet, retired Chief Justice of the Brazilian Supreme Court, Mr. Andreas Pohlmann, Chief Compliance Officer of Siemens AG from 2007 to 2010, and the Executive Director of Governance, Risk and Compliance, Mr. Joao Adalberto Elek Junior.

216.    In response to revelations referenced above, the price of Petrobras Common ADRs declined from $6.56 per ADR on January 28, 2015 to $6.40 per ADR (a 2.44% decline) on January 29, 2015, on extremely heavy trading volume.  The price of Petrobras Preferred ADRs declined from $6.94 per ADR on January 28, 2015 to $6.61 per ADR (a 4.76% decline) on January 29, 2015, on extremely heavy trading volume.  Petrobras bonds listed on the NYSE also fell in response to the revelations referenced above.

217.    Investors and analysts were frustrated that Petrobras failed to write down the assets involved in the kickback scheme.  For example, a January 28, 2015 analyst report by HSBC Global Research stated, in pertinent part:

> We have been supporting a long term cautious view on Petrobras investment case for a while.  We believe that now the uncertainties surrounding the audited balance sheet disclosures and the potential impact of up to USD34bn impairment (76% of current market cap) add too much risk to the case.  We have very low visibility about the potential upside to Petrobras stock at this stage.

> We are downgrading Petrobras to Underweight (V), from Neutral (V), on the back of: 1) limited visibility on when and how will the write-off of recent corruption scandals will affect the company, 2) negative FCF generation for a long period, 3) extremely high leverage at 4.6x Net Debt/EBITDA, and 4) expensive multiples.

218.    On January 28, 2015, *Reuters* published an article entitled "Petrobras Reports

Earnings Without Graft Writedowns Despite Delays," reporting that Petrobras released

unaudited third quarter results after nearly a three-month delay, without an estimate of how the

kickback scheme had overvalued its assets.  The article stated, in pertinent part:

> Brazil's Petrobras released delayed unaudited third-quarter results
> on Wednesday, but the state-run oil company's shares slumped as
> it left investors in the dark over the financial impact of a
> multibillion-dollar corruption scandal.
>
> Petroleo Brasileiro SA, as Petrobras is formally known, reported
> quarterly net profit slid 9.1 percent from the year-ago period to
> 3.09 billion reais ($1.20 billion).  It postponed an initial plan to
> publish the results in November after a stream of corruption
> allegations snowballed into a nationwide scandal.
>
> The much-anticipated results, however, did not include what
> investors most want to know: a rough estimate of how badly
> corruption over-valued the company's assets.  The state-owned oil
> company reversed an initial decision to include such writedowns
> under pressure from its chairman, who is close to Brazil's ruling
> Workers' Party, a person with direct knowledge of the situation
> told Reuters.
>
> Failure to deliver the results would have put Petrobras at risk of
> violating its bond covenants, although it remains to be seen
> whether the limited report will satisfy debtholders.  The scandal
> itself had already cut Petrobras, the world's most-indebted and
> least-profitable major oil company, out of capital markets and put
> it at risk of losing its investment-grade credit rating.
>
> * * *
>
> Investors drove down Petrobras stock in the wake of the earnings
> release.  Common and preferred shares fell nearly 10 percent in
> afternoon trading in São Paulo, with U.S.-listed American
> Depositary Receipts down a bit less.
>
> "Without the writedown, what's the point?" wrote analyst Ricardo
> Kim of XP Investimentos, a Brazilian brokerage that recommends
> investors avoid the stock.
>
> After initially deciding to take the writedown last week, the board
> reversed itself under pressure from Chairman and former Finance
> Minister Guido Mantega, the person with direct knowledge said.

73

\* \* \*

The company is now likely to take the writedowns in its fourth-quarter audited financial statement, which is expected by the end of April, the source added.

\* \* \*

'IMPRACTICAL TO QUANTIFY'

CEO Foster acknowledged that graft and other corruption-related spending should have been booked in past financial statements, but she said the company was still looking at ways to account for the charges in accordance with securities regulations in Brazil and the United States.

"We concluded that it was impractical to quantify these values with precision, given that the payments were made by outside suppliers and cannot be traced to the company's accounting books," Foster wrote in a letter to shareholders and investors accompanying the earnings release.

Brazilian accounting experts questioned that explanation.

"There is no reason for the company not to have estimated, even in a provisional way, the writedowns related to corruption," said Reginaldo Gonçalves an accounting professor at Faculdade Santa Marcelina, a São Paulo university.

219.    On January 29, 2015 Moody's downgraded Petrobras to the lowest level of investment grade, citing the risk resulting from the Company's inability to quantify the costs of the corruption scandal as a main reason for the downgrade.

220.    In response to the January 29, 2015 Moody's downgrade and to further disclosures concerning the scope of the bribery scheme, Petrobras Common ADRs fell approximately 6.1%, from $6.40 on January 29, 2015, to $6.01 on January 30, 2015.  Petrobras Preferred ADRs likewise fell approximately 7%, from $6.61 on January 29, 2015, to $6.15 on January 30, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

221.    On February 3, 2015, Fitch Ratings downgraded Petrobras debt from BBB to

BBB-.

222.    On February 6, 2015, Petrobras announced the appointment of a new CEO, Aldemir Bendine.  It was reported that the independent directors of Petrobras learned of the appointment from news reports prior to the Board vote, and all three independent directors voted against the appointment.

223.    In response, Petrobras Common ADRs fell approximately 8%, from $7.11 on February 5, 2015, to $6.54 on February 6, 2015.  Likewise, Petrobras Preferred ADRs fell approximately 8.7%, from $7.22 to $6.59.  Petrobras bonds listed on the NYSE also fell following this news.

224.    On February 24, 2015, Brazil's Attorney General filed criminal charges against Cerveró, accusing him of money laundering and criminal conspiracy.  The same day, Moody's cut Petrobras' debt rating to junk status, and indicated more downgrades may follow. According to Moody's, the downgrade was due to increasing concerns about the investigation into the huge corruption scheme which involved several high level executives and major construction companies in Brazil.  Bloomberg reported that "Brazilian Markets Roiled as Moody's Cuts Petrobras to Junk Grade."

225.    On the news of the Cerveró charges and the Moody's downgrade, Petrobras Common ADRs fell approximately 5.4%, from $6.86 on February 24, 2015, to $6.49 on February 25, 2015.  Petrobras Preferred ADRs also fell, by approximately 6.7%, from $6.99 on February 24, 2015, to $6.52 on February 25, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

226.    On Friday, March 6, 2015, Brazil's Supreme Court released a list of 49 politicians whom the prosecutor recommended for investigation for crimes connected with a

75

massive kickback scheme centered on the country's state-owned oil company Petrobras. On March 7, 2015, it was reported that the Supreme Court authorized the investigation of charges involving those 49 political leaders. Included on the list were the presidents of both houses of Congress, seven former cabinet ministers, one ex-president of Brazil plus other congressional leaders.

227. On this news, on March 9, 2015, Petrobras Common ADRs fell approximately 6.2%, from $5.96 on March 6, 2015, to $5.59 on March 9, 2015. Petrobras Preferred ADRs fell by approximately 6%, from $6.03 on March 6, 2015, to $5.68 on March 9, 2015. Petrobras bonds listed on the NYSE also fell following this news.

### D.    Additional Revelations of the Fraud Further Harm Petrobras' Stock Price

228. On March 18, 2015, additional details about the regulators' investigations of the Petrobras kickback scheme were revealed. On that date, *Reuters* published an article entitled "Brazil Audit Court to Investigate Petrobras Board Members," reporting that Brazil's Federal Audits Court decided to investigate whether Petrobras' Board practiced "acts of ruinous management" or failed "to act with the necessary care." *Reuters Africa* published an article entitled "Brazil Comptroller to Probe More Contractors in Petrobras Scandal," reporting that Brazil's Comptroller-General's Office added six construction and engineering firms to its investigation of the Petrobras kickback scheme. *The Wall Street Journal* published an article entitled "Swiss Authorities Order Freeze of Assets Related to Petrobras Scandal," reporting that Switzerland's Office of the Attorney General ordered the freezing of approximately $400 million in assets in Swiss bank accounts connected to the Petrobras kickback scheme.

229. In response to the revelations referenced above, the price of Petrobras Common ADRs declined from $5.66 per ADR on March 18, 2015 to $5.26 per ADR (a 7.07% decline) on

March 19, 2015, on extremely heavy trading volume. The price of Petrobras Preferred ADRs declined from $5.75 per ADR on March 18, 2015 to $5.39 per ADR (a 6.26% decline) on March 19, 2015, on extremely heavy trading volume. Petrobras bonds listed on the NYSE also fell in response to the revelations referenced above.

### E.      Petrobras Took a $17 Billion Write-Down But Failed to Adequately Write Down Assets Involved in the Kickback Scheme

### 1.      Petrobras Admitted to Massive Overstatement of Its Assets as a Result of Pervasive Fraud

230.     On April 23, 2015, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the 2014 fiscal year ("4Q14 Form 6-K"). The 4Q14 Form 6-K admits to the basic structure of the long-running kickback scheme and included a *$17 billion write-down* to correct its prior false and misleading financial statements.

231.     In its April 22, 2015 earning announcement, Petrobras described the basic structure of its fraudulent scheme as follows:

> According to the information available to the Company described above, under the payment scheme, a large number of contractors and suppliers colluded with the former Petrobras personnel to overcharge Petrobras under construction contracts and contracts to provide Petrobras with goods and services, and used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or the former Petrobras personnel.
>
> . . .
>
> In addition to the payment scheme, the investigations identified several other specific instances in which Petrobras was overcharged in connection with the acquisition of [PP&E]. The amount that Petrobras was overcharged was used to make unrelated payments to Petrobras personnel.
>
> . . .
>
> These records reflect the terms of the contract entered into by the

Company, which entailed payments that were inflated because of the conspiracy among the cartel members and the former Petrobras personnel to overcharge Petrobras.

232.   By Petrobras' own admission, Petrobras executives "colluded" with a "large number of contractors" to "overcharge Petrobras under construction contracts" and "used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or the former Petrobras personnel." As this admission shows, Petrobras itself acknowledges the awarding of inflated contracts to the cartel, as well as the kickbacks to Petrobras executives and their political allies.

233.   Petrobras also admitted that its failure to disclose the bribes and properly account for them as expenses, rather than assets, rendered Petrobras' financial statements materially false and misleading throughout the Relevant Period.  Both GAAP (which governed the Company's financial statements prior to January 1, 2011) and IFRS (which governed the Company's financial statements after January 1, 2011) prohibited Petrobras' capitalization of bribes and inflated costs as "assets" in the Company's financial statements.

234.   IAS 16 states that "[a]n item of [PP&E] that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction."  Similarly, under ASC 360, companies may record the "historical cost" of PP&E, which includes only "the costs necessarily incurred to bring it to the condition and location necessary for its intended use."

235.   Petrobras admitted that the bribes received by Petrobras executives and their political allies, as well as the fraudulent overpricing of contracts awarded to the cartel, were not "costs" of the assets under IAS 16 because they were not "given to acquire an asset at the time

78

of its acquisition or construction." Likewise, Petrobras admitted that these amounts were not "necessarily incurred to bring [the asset] to the condition and location necessary for its intended use" under ASC 360. Thus, instead of treating the bribes and inflated contracts as assets and capitalizing them under PP&E, it should have accounted for them as expenses. By failing to do so, Petrobras materially overstated the value of its assets, profitability, and shareholder equity throughout the Relevant Period.

236. Petrobras has now admitted that this error rendered the Company's financial statements false and misleading, and Petrobras recorded a $2.5 billion write-down to recharacterize the 3% kickbacks as expenses, and not assets booked under PP&E. The Company described the rationale for the recharacterization as follows:

> As previously mentioned, Petrobras believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical cost of the [PP&E]. Therefore, under Brazilian tax legislation, this write-off is considered a loss resulting from unlawful activity and subject to the evolution of the investigations in order to establish the actual extent of the losses before they can be deducted from an income tax perspective.
>
> . . .
>
> The Company included in its historical cost for property, plant and equipment all of the amounts paid under the affected contracts. However, the Company believes that the amount of its contract payments representing overpayments to contractors and suppliers pursuant to the payment scheme should not have been capitalized as property, plant and equipment.
>
> . . .
>
> Based on the available information described above, the Company concluded that the portion of the costs incurred to build its [PP&E] that resulted from contractors and suppliers in the cartel overcharging the Company to make improper payments should not have been capitalized.

237.    Reflecting both the indisputable evidence and institutionalization of the scheme, the Company's 4Q14 Form 6-K accounted for the effect of the 3% kickbacks for *every single contract* entered into between Petrobras and the cartel members between 2004 and April 2012. In other words, Petrobras admitted that the bribes were so pervasive that they likely infected *each and every* contract entered into with a member of the cartel from 2004 to April 2012.  The Company explained its methodology as follows:

> The estimate assumes that all contracts with the identified counterparties were affected and that 3% represents the amount by which the Company overpaid on those contracts.  Both assumptions are supported by the testimony, even though some testimony indicated lower percentages with respect to certain contracts, a shorter period (2006 to 2011), or fewer contractors involved.
>
> . . .
>
> [T]he information available to the Company is, in general, consistent in terms of the individuals and companies involved in the payment scheme, the period during which the payment scheme was in effect, and the percentage of overcharging applied over the total contract values under affected contracts and used to fund the improper payments made by contractors and suppliers.

238.    As these statements show, Petrobras has admitted that the testimony of Petrobras executives and others was "consistent in terms of the individuals and companies involved" as well as in terms of "the period during which the payment scheme was in effect, and the percentage of overcharging applied over the total contract values under affected contracts."  In other words, Petrobras has admitted that every single one of the Company's contracts with the cartel was likely infected by a 3% kickback.  Using this methodology, the Company estimated that $2.5 billion in "improper payments" were made to Petrobras executives, political officials, and contractors over that eight-year period.

239.    The Company even prepared a summary table identifying the total value of its

contracts with the cartel from 2004 to April 2012 in each of its business segments, which total

**$81.4 billion** and amount to over one-third of the Company's assets:

| "Write-off – overpayments incorrectly capitalized" | E&P | RTM | GAS & POWER | DISTRIB. | INTER. | CORP. | TOTAL |
|---|---|---|---|---|---|---|---|
| Payment scheme: | | | | | | | |
| Total contract amounts [*] | 25,573 | 45,233 | 8,663 | 309 | 307 | 1,355 | 81,440 |
| Estimated aggregate overpayments (3%) | 767 | 1,358 | 260 | 9 | 9 | 41 | 2,444 |
| Unrelated payments (outside the cartel) | 57 | – | 4 | – | – | – | 61 |
| | 824 | 1,358 | 264 | 9 | 9 | 41 | 2,505 |
| Reversal of depreciation of the affected assets | (35) | (81) | (21) | – | – | (4) | (141) |
| Impact on property, plant and equipment | 789 | 1,277 | 243 | 9 | 9 | 37 | 2,364 |
| Write-down of tax credits related to affected assets [**] | 15 | 121 | 23 | – | – | 4 | 163 |
| Write-off – overpayments incorrectly capitalized | 804 | 1,398 | 266 | 9 | 9 | 41 | 2,527 |

[*] Of this amount, US$ 17,999 represents amounts scheduled to be paid after September 30, 2014.
[**] Write-down of tax credits that will not be applicable in the future.

240.   On April 22, 2015, in addition to the $2.5 billion write-down which corrected for the improperly accounted for 3% kickbacks, the Company also took a $14.7 billion impairment charge attributable to, among other things, "(i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; (iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth."

241.   The largest impairments in this regard were taken on two major Brazilian refineries central to the bid rigging and kickback scheme: the Comperj refinery ($8.2 billion impairment charge) and the second refinery unit at Abreu in Northeast Brazil ($3.4 billion impairment charge), both of which are described in detail below.  Thus, the $14.7 billion impairment charge was largely attributable to the bribery scandal, as the scandal, and the facts underlying it, directly caused "project planning deficiencies," the "delay in expected future cash inflows," and the increased "risk premium" for the projects.

242.   In its 4Q14 Form 6-K, Petrobras also admitted that the bribery and kickback scandal had harmed Petrobras by limiting its access to capital markets.

243.   *The Wall Street Journal*, in an April 22, 2015 article entitled "Brazil's Petrobras

81

Reports Nearly $17 Billion in Asset and Corruption Charges," noted that the Company had been locked out of the capital markets during 2014 due to its inability to issue accurate financial statements.  In addition, when the bribery and kickback scandal began to unravel, payments to suppliers and contractors on the Comperj and Abreu projects ceased, causing many of them to become insolvent.  As reported in a February 11, 2015 article in the *New York Times*, entitled "Corruption Scandal at Petrobras Threatens Brazil's Economy," in the wake of Operation Car Wash, Alumini Engineering filed for bankruptcy and OAS, the country's fifth-largest engineering company and a major Petrobras subcontractor, missed bond payments and was trying to negotiate with creditors to avoid bankruptcy.

244.    The 4Q14 Form 6-K noted that these two factors, *i.e.*, the inability of Petrobras to access the capital markets and the insolvency of suppliers and contractors on the Comperj and Abreu projects, caused the Company to postpone its refining projects for an extended period of time.  According to the 4Q14 Form 6-K, this, in turn, caused the Company to use a higher discount rate and delay expected future cash flows in the calculus of the impairment charges on those assets.

245.    On April 22, 2015, Petrobras admitted that its financial statements failed to disclose the impact that Operation Car Wash had on the recoverable values of material portions of its long-lived assets throughout the Relevant Period.  Specifically, with regard to the Comperj and Abreu refinery projects, Petrobras disclosed:

> Impairment Property, plant and equipment and intangible assets
>
> For impairment testing purposes the Company generally uses the value in use of its property, plant and equipment and intangible assets (individually or grouped into cash-generating units-CGUs) as their recoverable amount.  In measuring value in use the Company bases its cash flow projections on (i) the estimated useful life of the asset or assets grouped into the CGU; (ii) assumptions

82

and financial budgets/forecasts approved by Management for the period corresponding to the expected life cycle of each different business; and (iii) a pre-tax discount rate, which is derived from the Company's post-tax weighted average cost of capital (WACC). The Company's identified cash-generating units are set out in note 5.2.

* * *

*However, during the quarter ended December 31, 2014, changes in circumstances prompted a review of the Company's planned projects and ultimately led Management to revise certain projects under construction.*  As a result, Petrobras has recently decided to postpone for an extended period of time the completion of the following refining projects: (i) Petrochemical Complex of Rio de Janeiro (Complexo Petroquimico do Rio de Janeiro - Comperj); and (ii) the second refining unit in the Abreu e Lima refinery (RNEST).  For that reason, as of December 31, 2014, those assets under construction were removed from the "Downstream CGU" and were tested for impairment individually.

*Those circumstances include:* (i) a decrease in expected future operating revenues following the decline of international crude oil prices; (ii) the devaluation of the Brazilian real, and the increased cash outflows to service the Company's debt in the near term, most of which is denominated in foreign currencies; (iii) *Petrobras' current inability to access the capital markets;* and (iv) *insolvency of contractors and suppliers and a consequent shortage of qualified contractors and suppliers (as a result of the difficulties created for suppliers by the Lava Jato investigation or otherwise).*

* * *

Comperj

An impairment loss of [US$ 8,220 million] was recognized in Comperj. . . .  The impairment loss is mainly attributable to: (i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; (iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth.

Second refining unit in RNEST

An impairment loss of US$ 3,442 [million] was recognized in the second refining unit in RNEST. . . . The impairment loss is mainly

attributable to: (i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; (iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth.

246.    As noted above, the Company's use of a higher discount rate and delay of expected future cash flows in the calculus of the 2014 fourth quarter impairment charges gave rise to the combined $11.662 billion impairment charge on Petrobras' Comperj and Abreu refining assets.  Accordingly, the $11.662 billion impairment charge on Petrobras' Comperj and Abreu refining assets was a result of the bribery and kickback scandal.

247.    That the impairment charge on the Comperj and Abreu refining units was due, at least in part, to the payment and unrelated payment schemes is further demonstrated by the fact that Petrobras has now written off *85%* of the value that it previously reported for Comperj and *55%* of the value that it previously reported for Abreu.

248.    In an April 28, 2015 article entitled "Three Petrobras Board Members Criticize 2014 Earnings Calculations," *The Wall Street Journal* reported that three independent members of Petrobras' 10-member Board chided the Company's calculations of its 2014 financial results. The April 28, 2015 article further reported that Petrobras Board member Mauro Rodrigues da Cunha, who decided not to run for re-election due to frustration with the government's role in the Company, "blasted Petrobras' methodology in calculating the asset impairment, saying it only partially reduced the massive overvaluation of refineries on Petrobras' books."

249.    According to the April 28, 2015 article, Silvio Sinedino Pinheiro, another independent Petrobras Board member, "also cited Petrobras' methodology for calculating the asset impairment as a reason for voting against the [4Q14 Form 6-K] release."  He noted that part of the troubled Abreu refinery was not included in the impairment, even though it cost the

84

Company $81,000 per barrel of capacity to build, compared with a "'maximum international average' of $35,000."

### 2.     Petrobras' Financials Are Overstated By Billions More Than It Has Disclosed

250.   Although Petrobras took a $2.5 billion write-down to reflect the value of the 3% kickbacks and impaired its contracts with the cartel by approximately $14.7 billion, subsequent disclosures indicated that those were insufficient and disclosed additional information concerning the fraud, causing further losses.  Petrobras admitted that "the amount of [the Company's] contract payments representing overpayments to contractors and suppliers pursuant to the payment scheme should not have been capitalized as [PP&E]" and its disclosures reveal that its contract values represented substantial "overpayments . . . pursuant to the payment scheme."

251.   Petrobras' admission in this regard is required by both GAAP and IFRS, which prohibit the booking of inflated contract prices as assets where the inflation is attributable to illegal conduct such as a bid-rigging scheme.  Specifically, under GAAP ASC 360, a company may record the "historical cost" of PP&E as an asset, defined as the "cost[] necessarily incurred to bring [the asset] to the condition and location necessary for its intended use."  It is plainly unnecessary to inflate contract prices to facilitate a bid rigging and kickback scheme, so any portion of the contract prices above the 3% kickback associated with bid rigging is not properly booked as an asset under PP&E.  Likewise, the Company itself explained that "Petrobras believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical cost of [PP&E]."

252.   Furthermore, Petrobras relied on the testimony of key participants in the bid rigging and bribery scheme in deciding to take a write-down for the estimated value of 3% for

the kickbacks.  Petrobras cannot credibly take the position that this testimony is reliable to the

extent it revealed 3% kickbacks to Petrobras executives, politicians, and political parties, yet

unreliable to the extent it revealed a criminal conspiracy to fix contract prices.  The Company's

apparent decision to ignore the price inflation attributable to fraud—above and beyond the 3%

kickbacks—cannot be squared with its previous admissions concerning the reliability of the

public testimony and the impropriety of counting any fraudulent overpayments as assets under

PP&E.

253.    In connection with the Company's long-delayed release of its financial results in

April 2015, certain members of Petrobras' Board objected to the Company's failure to further

write down the value of PP&E connected to major refinery assets because of these concerns.

254.    For example, Board member Mauro Rodrigues Da Cunha voted not to approve

the Company's financial statements for year-end 2014 in part because he concluded that the

Company had not written down the value of the Comperj and Abreu assets sufficiently.

Specifically, Mr. Cunha's written explanation for his vote stated as follows:

> Last year, I presented my opinion on the "apparent inadequacy of
> the investments accounting in refineries."  I reaffirm my vote this
> year.
>
> The facts publicly disclosed on 2014 and 2015 confirmed that the
> financial statements of 2013 presented inadequate amounts on its
> fixed assets.  Besides the information on 'Operação Lava Jato' and
> high discrepancies between RNEST and Comperj project costs and
> international metrics, we acquired more evidences from the
> problem the independent evaluation retained by the Executive
> Board to analyze which assets suffered from corruption
> information.  The discrepancy between fair value and book value –
> although is not suitable for an immediate accounting entry, under
> CPC 01 – made it clear that it had something wrong with the
> parameters used by the Company to execute the impairment tests
> heretofore.
>
> We are looking at an impairment accounting presentation that, in

86

my opinion, is not related to the overvaluation of our assets.

We had information that the refinery assets that suffered losses are restricted to RNEST projects – Train 2 and Comperj – on account of recent decision of the executive board on postponing such investments. In other words, the decision have caused such loss, and not (apparently) due to assets overvaluation, presented since 2013. Therefore, such amounts are not related to those assessed by the independent appraisers. . . .

I do not agree with the approach.

For example, by the amounts presented by the Board of Directors, the Abreu e Lima Refinery is included in our accounting books to an impressive multiple of 27X EBITDA. The impairment proposed would take such indicator to 22X – also above any desirable parameter. The same might be applied to Comperj, and even to other refineries that received significant investments in the last years (including the installation of HDT units).

255.    Mr. Cunha's concern was that there was something fundamentally flawed in the Company's impairment testing with respect to the Abreu and Comperj refineries. Even after the $17 billion write-down, Mr. Cunha notes that the valuation of those refineries on the Company's books (22 times EBITDA) is still "above any desirable parameter." Mr. Cunha's critique further pointed out the "high discrepancies between RNEST and Comperj project costs and international metrics." Contrary to the Company's prior false representations, this "high discrepancy" was not due to market and technical challenges, but instead was due to a massive bid rigging and kickback scheme. The $17 billion earnings charge, however, does not fully grapple with that excessive discrepancy, which is directly attributable to the fraudulent conspiracy.

256.    Board Members Reginaldo Ferreira Alexandre and Walter Luis Bernardes Albertoni agreed with Mr. Cunha's critique, and explained that they objected to the Company's 2014 financial statements in part because "[t]he volume of the difference between fair value and

book value [with respect to Abreu and Comperj] made it clear that there was something very wrong with the parameters that have been used by the Company to perform asset impairment tests."

257.    Board member Silvio Sinedino also objected to the Company's $17 billion write-down as inadequate.  Mr. Sinedino noted that in its initial attempt to calculate the write-off, following PwC's recommendation, "the Company hired two external consultants that, with total independence, evaluated the write-off amount in R$ 88 billion [$30 billion]. Such amount caught the attention of PwC, creating the need to use another method of assessment.  Based on such amount, a percentage write-off for corruption was established in the corrupted projects, use of RGU (Revenue Generating Unit) to all operation units and fair value, as accomplished by the two external Audits, to works in progress and shutdown.  I agree with the use of RGU, but I do not agree that operating units such as RNEST Train 1 have not written-off individual expense when it is known that they should have cost US$ 35 thousand/refining barrel capacity, by the maximum international average cost, but we have US$ 81 thousand/refining barrel capacity in RNEST."

258.    Mr. Sinedino, like several other directors, believed that the Company's $17 billion write-down failed to adequately write down the value of the Abreu and Comperj refineries.  Like Mr. Cunha, in light of the corruption scandal, Mr. Sinedino was concerned about the discrepancy between the cost of the Abreu refinery and the cost of similar international projects.  As we now know—but the Company has failed to fully address—this discrepancy was caused by the bid rigging and kickback scheme, and not market and technical challenges as the Company had previously and falsely represented.

### 3.    Additional Disclosures Concerning The Fraud Have Led To Additional Losses

259.    On April 27, 2015, *Barrons.com* reported that Morgan Stanley had changed its Petrobras recommendation from "neutral [hold]" to "sell" based on the Company's debt level and the fact that Petrobras' operating cash flow was not enough to support its leverage level.  On this news, Petrobras Common ADRs declined $0.66 or 6.61%, to close at $9.33, and Petrobras Preferred ADRs declined $0.20 or 2.24%, to close at $8.71 on April 27, 2015.  Petrobras bonds listed on the NYSE also fell following this news.  On May 15, 2015, eight minutes before the market closed, it was reported that Petrobras admitted that its internal controls were deficient. On this news, Petrobras' Common ADRs declined $0.44 or 4.34%, to close at $9.69, and Petrobras' Preferred ADRs declined $0.24 or 2.56%, to close at $9.14 on the next trading day on May 18, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

260.    On May 19, 2015, *Folha* reported that eight members of the Petrobras Parliamentary Inquiry Commission ("CPI") went to London to hear SBM's former employee Johnathan Taylor, who was expected to give details about the relationship between SBM and the money launderer Julio Faerman.  The article details that Faerman's Virgin Islands account received over $31 million in resources from Petrobras.  On this news, Petrobras Common ADRs declined $0.60 or 6.19%, to close at $9.09, and Petrobras Preferred ADRs declined $0.62 or 6.78%, to close at $8.52 on May 19, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

261.    On May 22, 2015, *Folha* reported that documents sent from Monaco's authorities to Operation Lava Jato showed that Petrobras' former officers Duque and Jorge Zelada opened accounts in Monaco, making it clear that both Duque and Zelada had been associated with the transfer of funds from Petrobras to said locations.  On this news, Petrobras Common ADRs

declined $0.34 or 3.58%, to close at $9.15, and Petrobras Preferred ADRs declined $0.33 or

3.75%, to close at $8.48 on May 22, 2015.  Petrobras bonds listed on the NYSE also fell

following this news.

262.    On May 26, 2015, *Bloomberg* reported that Petrobras' former Head of

International (Nestor Cerveró) was sentenced to five years in prison.  Additionally, on the same

day, the Brazilian newspaper *O Estado de São Paulo* reported that Eduardo Leite, a former

executive of the cartel contractor Camargo Correa, confirmed the cartel operation at Petrobras

during a CPI hearing for the Brazilian House of Representatives.  On this news, Petrobras

Common ADRs declined $0.64 or 6.99%, to close at $8.51, and Petrobras Preferred ADRs

declined $0.61 or 7.19%, to close at $7.87 on May 26, 2015.  Petrobras bonds listed on the

NYSE also fell following this news.

263.    On June 19, 2015, *Bloomberg* reported that the top executives (including CEOs)

of Brazil's biggest contractors—Odebrecht and Andrade Gutierrez—were arrested and that their

offices were searched and seized by the Federal Police.  On this news, Petrobras Common

ADRs declined $0.29 or 2.99%, to close at $9.40, and Petrobras Preferred ADRs declined $0.27

or 3.08%, to close at $8.50 on June 19, 2015.  Petrobras bonds listed on the NYSE also fell

following this news.

264.    On July 2, 2015, after the close of trading, the *Financial Times* reported that

Petrobras' losses from the corruption scheme could be larger than reported, according to a

statement given by the Brazilian federal prosecutors suggesting that the state-run company could

possibly be forced to adjust its 2014 financial statements.  It was reported that Petrobras' losses

could reach 20% of the value of the contracts.  A delegate from the Federal Police, Igor Romario

de Paulo, one of the Operation Lava Jato coordinators, affirmed that the evidence "could suggest

losses to Petrobras of 15-20% of its contracts." On this news, Petrobras Common ADRs declined $0.63 or 7.13%, to close at $8.20, and Petrobras Preferred ADRs declined $0.64 or 8.07%, to close at $7.29 on the following trading day, Monday, July 6, 2015. Petrobras bonds listed on the NYSE also fell following this news.

265. On July 8, 2015, *Bloomberg* reported that the President for the Brazilian agency Control Council for Financial Activities ("COAF"), Antonio G. Rodrigues, said during a hearing before the CPI that his agency submitted 267 reports to Operation Lava Jato investigators, flagging suspicious financial transactions in a total of 51.9 billion reais. On this news, Petrobras Common ADRs declined $0.25 or 3.02%, to close at $8.04, and Petrobras Preferred ADRs declined $0.24 or 3.24%, to close at $7.17 on July 8, 2015. Petrobras bonds listed on the NYSE also fell following this news.

266. On July 17, 2015, *Valor* reported that new allegations given by Julio Camargo during a testimony before the CPI implicated the President of the House, Eduardo Cunha, in the scandal. *Valor* also reported that the Brazilian prosecutors opened a criminal investigation against the former president Luiz Inacio Lula da Silva regarding his relationship with the cartel contractor Odebrecht. On this news, Petrobras Common ADRs declined $0.46 or 5.47%, to close at $7.95, and Petrobras Preferred ADRs declined $0.38 or 5.03%, to close at $7.18 on July 17, 2015. Petrobras bonds listed on the NYSE also fell following this news.

267. On July 20, 2015, *Bloomberg* reported that Camargo Correa's former executives, Dalton Avancini (former CEO) and Eduardo Leite (former VP), were convicted and would serve over 15 years in prison each for corruption, money laundering and organized crime, all relating to Petrobras' corruption scandal. On this news, Petrobras Common ADRs declined $0.46 or 5.79%, to close at $7.49, and Petrobras Preferred ADRs declined $0.39 or 5.43%, to close at

$6.79 on July 20, 2015. Petrobras bonds listed on the NYSE also fell following this news.

268.   On July 21, 2015, after the close of trading, *Bloomberg* reported that Braskem (part of the cartel contractor Odebrecht's group) was going to revise a contract with Petrobras after the Company confirmed that an internal investigation committee found that some procedures related to the 2009 naphtha supply agreement were not in conformance with the Company's internal guidelines. On this news, Petrobras Common ADRs declined $0.42 or 5.61%, to close at $7.06, and Petrobras Preferred ADRs declined $0.42 or 6.17%, to close at $6.39 on the following day, July 22, 2015. Petrobras bonds listed on the NYSE also fell following this news.

269.   On July 24, 2015, the Brazilian newspaper *O Estado de São Paulo* reported that Swiss documents gathered by the Operation Lava Jato investigators and Judge Moro reveal 10 offshore accounts used by Odebrecht to pay bribes, in a sophisticated payment scheme to Petrobras' officers, including Costa, Barusco, Duque, Cerveró and Zelada—a finding that justified the renewal of Marcelo Odebrecht's new prison decree. Also on that day, *Bloomberg* reported that Brazilian prosecutors were expected to formally charge executives from two of Brazil's top builders with participating in Brazil's biggest corruption scandal in history, the chief executive officer of Odebrecht and the president of Andrade Gutierrez. On this news, Petrobras Common ADRs declined $0.26 or 3.76%, to close at $6.65, and Petrobras Preferred ADRs declined $0.17 or 2.74%, to close at $6.04 on July 24, 2015. Petrobras bonds listed on the NYSE also fell following this news.

270.   On July 27, 2015, the Brazilian newspaper *O Estado de São Paulo* reported that former Petrobras' officers, including Gabrielli and Foster, were given high-value gifts by Odebrecht, including artwork by renowned artists. On this news, Petrobras Common ADRs

declined $0.40 or 6.02%, to close at $6.25, and Petrobras Preferred ADRs declined $0.36 or 5.96%, to close at $5.68 on July 27, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

271.   On July 28, 2015, after the close of trading, *Bloomberg* reported that the Brazilian judge decided to accept the charges against the Odebrecht and Andrade Gutierrez executives.  On this news, Petrobras Common ADRs declined $0.22 or 3.11% to close at $6.85, and Petrobras Preferred ADRs declined $0.18 or 2.81% to close at $6.22 on July 30, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

272.   On September 10, 2015, Standard & Poor's downgraded Petrobras two levels to BB (junk status), citing as a main reason for the downgrade the wide-ranging investigation into alleged kickback schemes at the Company.

273.   In response to the Standard & Poor's downgrade on September 10, 2015, Petrobras Common ADRs declined $0.24 or 4.72% to close at $4.85, and Petrobras Preferred ADRS declined $0.30 or 6.8% to close at $4.11 on September 10, 2015.  Petrobras Common ADRs then declined $0.29 or 5.98% to close at $4.56, and Petrobras Preferred ADRs declined $0.15 or 3.65% to close at $3.96 on September 11, 2015.  Petrobras bonds listed on the NYSE also fell following this news.

274.   On September 21, 2015, after the close of trading, *Reuters* reported on the sentencing of the Treasurer of the governing Worker's Party, Joao Vaccari, to just over 15 years in jail and included a statement by the lead Brazilian prosecutor concerning the fraud investigation.  On this news, Petrobras Common ADRs declined $0.24 or 5.53% to close at $4.10, and Petrobras Preferred ADRs declined $0.25 or 6.79% to close at $3.43 on September 22, 2010.  Petrobras bonds listed on the NYSE also fell following this news.

275.    On October 9, 2015, the lead prosecutor running Operation Lava Jato announced that the corruption-related losses announced by Petrobras were "only the tip of the iceberg." According to the prosecutor, "Looking at projections, the cost probably goes beyond 20 billion Reais [$5.3 billion]," rather than the 6.2 billion reais [$1.6 billion] announced by Petrobras.

276.    In response to the news, Petrobras Common ADRs fell approximately 4.4%, from $5.67 on October 9, 2015, to $5.42 on October 12, 2015.  Petrobras Preferred ADRs likewise fell approximately 3.8%, from $4.68 on October 9, 2015, to $4.50 on October 12, 2015. Petrobras bonds listed on the NYSE also fell following this news.

277.    As reflected in Petrobras' lower securities prices as of the filing of this Complaint, Petrobras is still failing to accurately report its PP&E and the Company may be forced to take billions of dollars in additional write-downs.

## IX.    PLAINTIFFS' RELIANCE

278.    To the extent available, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that the markets for Petrobras Securities were efficient markets for the following reasons, among others:

    a.      Petrobras Common and Preferred ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient stock market.  Petrobras Common Shares and Preferred Shares met the requirements for listing and were listed and actively traded on the Bovespa, a highly efficient stock market.

    b.      As a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF.

    c.      Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

    d.      Petrobras was followed by securities analysts employed by major

94

brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e.   The Petrobras, PifCo, and PGF debt securities actively traded in an efficient over-the-counter market. During the Relevant Period, these debt securities were widely traded by market makers, including J.P. Morgan, Barclays, Deutsche Bank, Citibank, Goldman Sachs, Merrill Lynch, and Credit Suisse. Moreover, during the Relevant Period, Petrobras, PifCo, and PGF were eligible to file, and on December 11, 2009 and August 29, 2012 did file, a Form F-3, which is a foreign entity's functional equivalent of the Form S-3. During the Relevant Period, the majority of these debt securities were publicly held. Additionally, during the Relevant Period, Petrobras' market capitalization reached a high of over $255 billion.

279.   As a result of the foregoing, the market for Petrobras Securities digested current information regarding Petrobras from all publicly available sources and reflected such information in the prices of the Petrobras Securities.

280.   A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in substantial part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Petrobras, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions during the Relevant Period as set forth above, that requirement is satisfied here.

281.   Throughout the Relevant Period, Vanguard investment managers also undertook research to identify companies in which to invest. As part of this research, they reviewed and analyzed representations made by the Company. Plaintiffs made investment decisions based on this market research and analysis. Vanguard investment managers relied on the Company's statements being materially complete, and as not omitting material information, including

95

information regarding Petrobras' financial condition and compliance with applicable laws and regulations.  Vanguard investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras' public statements were materially false and misleading and/or materially incomplete when deciding to purchase, sell, or hold Petrobras Securities during the Relevant Period.

## X.    LOSS CAUSATION

282.    As detailed herein, Defendants engaged in a scheme to deceive Plaintiffs and the market and a course of conduct that artificially inflated the price of Petrobras Securities and operated as a fraud or deceit on Plaintiffs by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed, and when the materialization of the risks that had been concealed by Defendants occurred and became apparent to the market, the prices of Petrobras Securities declined significantly as the prior artificial inflation came out of the Petrobras Securities prices.

283.    As a result of its purchases of Petrobras Securities, Plaintiffs suffered economic loss, *i.e.*, damages, under federal and state securities laws and common law.  Defendants' false and misleading statements had the intended effect and caused Petrobras Securities to trade at artificially inflated prices, with the price of Petrobras Common ADRs reaching as high as $53.46 on December 3, 2009, and the price of Petrobras Preferred ADRs reaching as high as $47.62 on December 3, 2009.

284.    By concealing from Plaintiffs the adverse facts detailed herein, Defendants presented a misleading picture of Petrobras' business, products, and operations.  As the truth about the Company was revealed to the market, the prices of Petrobras Securities fell significantly, removing the inflation from the prices, causing real economic loss to Plaintiffs,

who had purchased Petrobras Securities before and during the Relevant Period.

285.    As alleged above, the declines in the prices of Petrobras Securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Petrobras Securities negate any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

286.    The economic loss, *i.e.*, damages, suffered by Plaintiffs was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Petrobras Securities and the subsequent significant decline in the value of Petrobras Securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.  But for Defendants' repeated material misrepresentations, Plaintiffs would not have purchased Petrobras Securities in the quantities, or at the prices, at which they did.  When the truth about Petrobras' financial performance, internal control deficiencies, and pervasive accounting fraud was revealed to the market, the artificial inflation in Petrobras Securities was removed, causing Plaintiffs to suffer losses on their investments in Petrobras Securities.

## XI.    THE INDIVIDUAL DEFENDANTS' LIABILITY

287.    Because of the Individual Defendants' positions, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via

97

reports and other information provided to them in connection therewith.

288.    Each of the Individual Defendants, by virtue of his or her position, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal and state securities laws.

289.    As officers and controlling persons of a publicly held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants were also required to act lawfully and in accordance with the Company's best interests, avoid self-dealing, and provide true and complete information to the Company's shareholders under Brazilian corporate and securities laws.  The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

290.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Petrobras, each of the Individual Defendants had access to the adverse, undisclosed information about Petrobras' business prospects, financial condition, and performance, as particularized herein, and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Petrobras and its business issued or adopted by the Company materially false and misleading.

291.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

292.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Petrobras Securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Petrobras' business, operations, management, and the intrinsic value of Petrobras Securities; and (ii) caused Plaintiffs to

99

purchase Petrobras Securities at artificially inflated prices.

293.    During the Relevant Period, the Individual Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted with reckless disregard for the true information known to them at the time, for the reasons discussed above.  In doing so, the Individual Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of the securities, such as Plaintiffs.

### A.    Foster

294.    The evidence that Foster knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed above, or at a minimum was reckless for not knowing these matters, includes, but is not limited to the following:

a.    One of the persons involved in the scheme has said that Petrobras' CEO knew of and understood the scheme.

b.    In 2009, a Petrobras executive warned Foster about inflated contracts on refinery projects and was fired soon thereafter.

c.    The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CEO, Foster knew of the scheme or was reckless for not knowing of it.

d.    The fact that the scheme caused Petrobras' asset values to be overstated by over $2.5 billion supports an inference that Foster, as CEO, knew of the scheme or was reckless for not knowing of it.

e.    The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Foster, as CEO of the Company, knew of the scheme or was reckless for not knowing of it.

### B.    Gabrielli

295.    The evidence that Gabrielli knew of the bribery scheme, the inflation of

100

2715c1aa9ed53c5

Petrobras' asset valuations, and the falsity of the statements discussed above, or at a minimum

was reckless for not knowing these matters, includes the following:

    a.    Prosecutors have frozen Gabrielli's assets and are preparing an indictment against him. One of the persons involved in the scheme has said that Gabrielli knew of and understood the scheme.

    b.    The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CEO, Gabrielli knew of the scheme or was reckless for not knowing of it.

    c.    The fact that the scheme caused Petrobras' asset values to be overstated by over $2.5 billion supports an inference that Gabrielli, as CEO, knew of the scheme or was reckless for not knowing of it.

    d.    The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Gabrielli, the CEO of the Company, either knew of the scheme or was reckless for not knowing of it.

    e.    The fact that, as described in this complaint, Velosa forwarded her complaints to Defendant Gabrielli.

### C.    Barbassa

296.    The evidence that Barbassa knew of the bribery scheme, the inflation of

Petrobras asset valuations, and the falsity of the statements discussed above, or at a minimum

was reckless for not knowing these matters, includes the following:

    a.    The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CFO, Barbassa knew of the scheme or was reckless for not knowing of it.

    b.    The fact that the scheme caused Petrobras' asset values to be overstated by over $2.5 billion supports an inference that Barbassa, as CFO, knew of the scheme or was reckless for not knowing of it.

    c.    The fact that the scheme related to major assets and critical

infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that as CFO of the Company, Barbassa knew of the scheme or was reckless for not knowing.

## XII.   NO SAFE HARBOR

297.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## XIII.   EXCHANGE ACT AND STATE LAW FRAUD-BASED CLAIMS

### COUNT I
### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

298.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

299.   During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

300.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Petrobras Securities during the Relevant Period.

301.    Plaintiffs acquired Petrobras Securities without knowledge that Defendants had misstated or omitted material facts.  In acquiring Petrobras Securities, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by Defendants.

302.    Plaintiffs would not have purchased Petrobras Securities in the quantities they purchased, at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

303.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Petrobras Securities.

304.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT II
### For Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

305.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against the Individual Defendants.

306.    The Individual Defendants acted as controlling persons of Petrobras within the meaning of § 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Petrobras, the Individual Defendants had the power and authority to cause Petrobras to engage in the wrongful conduct complained of herein.

307.    By reason of such conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

308.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT III
### For Violation of Pennsylvania Securities Act § 1-401
### Against All Defendants

309.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

310.    During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were

made, not misleading.

311.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Petrobras Securities during the Relevant Period.

312.    Plaintiffs acquired Petrobras Securities in Pennsylvania without knowledge that Defendants had misstated or omitted material facts.  In acquiring Petrobras Securities, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by Defendants.

313.    Plaintiffs would not have purchased Petrobras Securities in the quantities they purchased, at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

314.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Petrobras Securities.

## COUNT IV
### For Violation of Pennsylvania Securities Act § 1-501
### Against Petrobras, PGF, and PifCo

315.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against Petrobras, PGF and PifCo (collectively, the "Section 501 Defendants").

316.    Each of the Section 501 Defendants either sold or offered the Petrobras Securities to Plaintiffs within the meaning of Section 1-501 of the Pennsylvania Securities Act and made a direct or indirect attempt or offer to sell or dispose of, or solicitation of an offer to purchase,

Petrobras Securities or interests therein to Plaintiffs.  In so doing, the Section 501 Defendants were motivated by the desire to serve their own financial interests.

317.   The Section 501 Defendants' sale or offer to sell, within the meaning of Section 1-501 of the Pennsylvania Securities Act, was directed to Pennsylvania and received by Plaintiffs in Pennsylvania.

318.   As alleged above, the Section 501 Defendants violated § 1-401 of the Pennsylvania Securities Act.

319.   Plaintiffs are willing to exchange their Petrobras Securities for the amount set forth in Section 1-501 of the Pennsylvania Securities Act, and Plaintiffs are entitled to damages for Petrobras Securities no longer owned in the amount set forth under Section 1-501 of the Pennsylvania Securities Act.

320.   As a result of this violation, the Section 501 Defendants are liable to Plaintiffs for rescission and/or damages as set forth in Pennsylvania Securities Act § 1-501.

321.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## XIV.   SECURITIES ACT AND STATE LAW CLAIMS

### A.      Overview

322.   The following allegations are in effect a separate complaint.  For the following claims there is no allegation of fraud, scienter or recklessness.  Plaintiffs' claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o, and Section

106

501 of the Pennsylvania Securities Act, 70 P.S. § 1-501, and are based on strict liability and/or the absence of any affirmative defense.

323.   Plaintiffs repeat, incorporate, and re-allege Sections II through V above by reference.

## B.   False and Misleading Statements

324.   Throughout the Relevant Period, Defendants made many materially false and misleading statements and omissions to Plaintiffs and the public at large through oral and written communications, including in their registration statements and prospectuses.  These included material misstatement concerning the value of Petrobras' assets, including property, plant and equipment ("PP&E"), and shareholder equity; Petrobras' profitability and expenses; Petrobras' compliance with GAAP and IFRS accounting standards; and the integrity and reliability of Petrobras' internal controls and financial reporting.

### 1.   Petrobras' Financial Statements Were Materially False and Misleading

325.   Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period.  In particular, by wrongfully recognizing the cash paid to government officials and Petrobras officials as assets instead of expenses, Petrobras materially overstated the value of its PP&E, its total assets, and its shareholder equity in each of its quarterly and annual financial statements during the Relevant Period.  In addition, Petrobras' net income and profitability was artificially and materially inflated during the Relevant Period because Petrobras failed to record an impairment charge—which would track through Petrobras' income statement—to correct for improperly overstated PP&E values.  Petrobras also reported expenses during the Relevant Period that were materially understated because, as Petrobras has admitted, certain payments should have been classified as

expenses, rather than assets booked under PP&E.

326.   Petrobras' May 28, 2010 Form 6-K represented that Petrobras' financial statements had "been prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made the same representations in each quarterly and annual statement it filed: the March 26, 2010 Form 6-K; August 25, 2010 Form 6-K; November 24, 2010 Form 6-K; March 17, 2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K.  Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this annual report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

327.   Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with GAAP, as Petrobras has admitted.

328.   Following Petrobras' transition to IFRS reporting, the Company represented that Petrobras' financial statements were "presented" and/or "prepared" "in accordance with IAS [IFRS's International Accounting Standard] 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)" in its May 17, 2012 Form 6-K; August 10, 2012 Form 6-K; October 30, 2012 Form 6-K; April 30, 2013 Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; May 12, 2014 Form 6-K; and August 11, 2014 Form 6-K. Similarly, the Company's 2011 Form 20-F; 2012 Form 20-F; 2013 Form 20-F; February 29, 2012 Form 6-K; February 6, 2013 Form 6-K; and February 26, 2014 Form 6-K were false and misleading when made because the Company's financial statements were not prepared in

accordance with IFRS, as Petrobras has admitted.

329.    The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by CEO Gabrielli and CFO Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "fairly presents, in all material respects, the financial condition and results of operations of the Company."  The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Defendants Foster and Barbassa.  The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E: "[PP&E] are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses."

330.    Each of these representations was false and misleading when made, because the Company's financial statements did not fairly present the Company's financial condition, because the carrying value of PP&E on the Company's balance sheet was materially overstated during the Relevant Period, and because the cost overruns in the Company's major contracts were not "necessary to bring the asset to working condition."

331.    In addition, the overstatement of the Company's reported shareholders' equity materially misrepresented the Company's financial ratios, including its debt-to-equity and financial-leverage ratios.  Financial ratios were material to Petrobras maintaining an investment grade rating and its ability to raise capital.  During the Relevant Period, the Company represented, including in a presentation to investors dated March 15, 2013, that a key financial

assumption for its investment grade rating was a leverage ratio lower than 35%. During the Relevant Period, Petrobras materially breached this important financial-leverage ratio.

332.     Furthermore, the Forms 20-F Petrobras filed with the SEC during the Relevant Period failed to disclose, in accordance with Item 3 of Form 20-F, the "significant factors" that either had or could have had a material effect on the Company's operating results during the Relevant Period, including information regarding governmental, economic, fiscal, monetary, or political policies or factors that materially affected, or could materially affect, directly or indirectly, the Company's operations.

### 2.     Defendants Made Materially False and Misleading Statements in Investor Conference Calls

333.     In its conference call with investors concerning its 2009 full-year results, Defendants provided materially false and misleading explanations of the cost overruns with respect to its key refinery projects. UBS analyst Lilyanna Yang asked why the Abreu refinery was expected to cost more than twice as much as refineries of similar complexity in the United States or Europe, and Defendant Gabrielli provided the false explanation that local infrastructure and environmental reasons were to blame for the overruns:

> <Q - Lilyanna Yang, UBS>: . . . And secondly, and more on the refining CAPEX, I would like to understand why for instance the Abreu and Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the United States or Europe? I might be missing something so I just wanted to understand if maybe it is related to infrastructure or something else, and maybe even the Maranhão and Ceará refineries seem to be a bit higher in terms of cost versus the international benchmark. So these are my two questions. Thank you.
>
> <A - José Sergio Gabrielli de Azevedo>: . . . The second thing is on the refinery costs, we are finishing the numbers. If you have the numbers, please tell me because we have not finished it, we do not have them.

110

<Q - Lilyanna Yang, UBS>: We got the numbers from what the global press said and from what local reports from what the TCU indicates.

<A - José Sergio Gabrielli de Azevedo>: OK, if you have them, which is another thing. But we are finishing the numbers and for sure that is something that we have to take into consideration on a qualitative basis. For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in which you go, produce the refinery and plug to the infrastructure and this is it.

<u>This is not our case. We have to develop part of the infrastructure within the project of the refinery. Power generation, power distribution, the utilization of residuals, transportation, some things that are necessary to build, the offsite of our refineries are bigger than the offsite of those international traditional companies.</u>

<u>These are important things to consider because the choice of a new refinery outside of the infrastructure existing today has several important reasons. One is the environmental reason.</u> The other is the marketing type of decision, because our refineries that have been planned to be built are in the Northeastern of Brazil, North of Brazil, they have a market that we do not have enough capacity today for refining in those markets, and also they have a competitive advantage to be near, closer to the United States, the Central America and the European markets. And this means that we have to pay to consider this difference.

But, I am talking about the qualitative type of numbers, <u>I do not have the quantitative right now to give you, because we are finishing our process.</u> And all people that are around me here, they have told me that they have not finished the numbers. If you have them, I would like to know them.

334.   In its conference call with investors concerning its second quarter 2010 results, investors again asked about the high refinery costs, and management once again explained that despite technical challenges, the investments were very important. Remarkably in hindsight, Costa responded that Comperj was the Company's "<u>most important expenditure</u>."

<Q - Arjun Murti>: Thanks, Ted. Just a follow-up question on the refining spending. I think you mentioned you had started spending on the Abreu e Lima refinery. What is the timing of developing a cost estimate and starting spending on – I think you call it

Premium I and Premium II – the additional 900,000 barrels a day of refining capacity you'd mentioned in your business plan? Thank you.

<A - Paulo Roberto Costa>: Yes.  <u>We are spending a little bit high with that money in Abreu e Lima refinery.  That's because we are on the construction phase.  We are in this at the beginning.  And this is the main reason why we spend more money this year in comparison with the last year.</u>

. . .

<Q - Arjun Murti>: I mean I guess, you have a five-year plan, which includes the building of Premium I and Premium II, and <u>so I was wondering the cost estimates for the Abreu e Lima refinery are quite high, presumably the natural refinery in part benefit from that infrastructure, so really just curious when the timeframe would be when you can give a cost estimate for  the next round of refining spending, and when you plan on actually starting with that construction?</u>

<A - Theodore M. Helms, Investor Relations Executive Manager>: Really, the Premium I or II are really happening, especially Premium I, really, Premium II is not really within the next five years.  And so what you'd say is that Premium I spending really only happens in starts beginning, assuming the project is approved in 2013, '014 and I think we're still, correct me if I'm wrong, Roberto, at a stage where saying, any – it's still in very development phase and saying anything about cost and prices would just be a pure guess.  We're just not even – haven't even – we're not close to being there yet.  Is that correct, Roberto?

<A - Paulo Roberto Costa>: Yes, that's right.

. . .

<Q - Paul Cheng>: Hey, guys.  Ted, the two refineries that are currently under construction, can you tell us again what is the cost estimate, and which one in the startup time, and see if there is any changes from previously what you disclosed?

<A - Theodore M. Helms, Investor Relations Executive Manager>: Yes.  Roberto, so cost estimate, I think we have in the past put out a number is that correct – publicly I think?

<Q - Paul Cheng>: Yes, one, I think they was talking about 12

billion, one is 9 billion.  I just wanted to see if that had been changed?

<A - Theodore M. Helms, Investor Relations Executive Manager>: To the best of my recollection, and I might have read in the press – I don't know if we ever had an official number, but anyway, but I don't think we have any – we haven't made ourselves any disclosure or certainly any change or – to the start up.  Do we have the dates, Roberto, these dates on startups of either Comperj or refineries in the Northeast?

<A - Paulo Roberto Costa>: We're expanding our investments.  We're expanding our investment money mainly in conversion units inside of the existing refineries and quality, to improve the color quality, 83 millimeters, and to expand our capacity.  Also, we have Northeast refinery.  We have a Comperj also.  And this is – we can say that this is our most important expenditure.

335.   Each of these statements concerning the reasons for the cost overruns at the Company's Abreu and Comperj refineries was materially false and misleading, because these statements failed to disclose that the true reason for the problems was caused by payments to third parties and a defective bidding process.

336.   Defendants made other misrepresentations to investors, including Plaintiffs, in separate conference calls with investors.  During the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Defendant Foster stated to analysts: "We have qualified personnel, we know how to work, and we know how to execute.  Throughout our history we've invested billions of dollars in research and development, and we know what we're doing.  Our reserves are absolutely real and legitimate."  On May 9, 2014, in response to an interview question asking Defendant Foster to identify "the most important aspects of the company's governance," Foster stated that Petrobras "compl[ies] with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United States, the Latibex and Bolsa y Mercado Espafioles, Spain and the National Securities Commission (CNV) and the

Buenos Aires Stock Exchange, Argentina."

337.   Defendant Foster's statements that the Company's reserves were "absolutely true and legitimate" and her statements attesting to Petrobras' compliance with the SEC's and NYSE's rules, including the SEC's requirement that all financial statements be accurately reported, were false and misleading for the reasons set forth above.

### C.   Petrobras Posted Materially False and Misleading Statements Online

338.   On its website, the Company claimed during the Relevant Period that "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts."  This statement was materially false and misleading because, in fact, employee functions were not segregated.

339.   The Company also claimed on its website during the Relevant Period that, with respect to third party suppliers, it "[carried] out integrity due diligence of our suppliers, joint venture partners and counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others: the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business."

340.   This statement was materially false and misleading because, in fact, the Company's selection of contractors was rigged and tainted by fraud and corruption, and lacked "integrity" and "due diligence."

341.   The Company's "Facts and Data" blog was another source of many materially false and misleading statements and omissions.

342.    On January 28, 2010, in response to newspaper articles reporting that Brazil's Audit Court, the TCU, had identified possible irregularities with respect to several of Petrobras' capital projects, the Company posted that "there have been no irregularities" in its contracts and that "[t]here are differences in the parameters used by TCU and Petrobras, resulting in different values in some of these works contracts." Petrobras further stated that "[t]he Company systematically works with regulatory agencies and, where there are differences, tries to clarify them - what has been done in the case of these four works." The very next day, on January 29, 2010, Petrobras further stated on its Facts and Data blog:

> [Petrobras] reaffirms that there has been no 'overbilling' or 'overpricing' in the [Abreu] works. The TCU uses National Department of Transportation Infrastructure (DNIT) criteria for road construction as a reference for contract analysis. Petrobras has already clarified innumerable times that those criteria do not apply to the ground leveling operations of a petroleum refinery, a much more complex work with specific conditions quite different from the characteristics of a highway. One of the great challenges for the construction of the [Abreu] refinery, in the ground leveling phase, was the type of soil of the region. Part of it is expansive, that is, with a great variation of volume and mobility. In addition to that the rainy season brought additional difficulties to the work.

343.    On October 8, 2010, in response to TCU allegations, Petrobras posted that it "reiterates that there are technical divergences between the methodologies adopted by the company and by TCU. The criteria utilized by the Court are insufficient and do not apply to works such as Comperj, much more complex with its own specificities. Petrobras collaborated with TCU in all its requests and there was no obstruction at any time."

344.    On November 9, 2010, in response to TCU allegations that the Abreu refinery contracts were overpriced, Petrobras posted a statement on its Facts and Data website stating:

> Petrobras denies that there were irregularities in the construction works of the Presidente Getulio Vargas (Repar) and Abreu e Lima (Rnest) refineries. . . . The criteria utilized by the TCU are not

applicable to works such as a petroleum refinery, more complex
and with their own specificities. . . . In the preparation of its call to
bids, Petrobras rigorously observes the terms of Decree No.
2,745/98, which deals with Simplified Bidding Procedure and
which endows the Company flexibility to develop its projects with
efficiency, economy, and profitability. Petrobras reiterates that the
criteria of acceptability of prices questioned by the Court are
aligned with national and international technical standards in
regard to the subject. In addition, in the formation of prices, the
Company also considers aspects related to safety items, the
environment, health, and social responsibility. These requirements
produce important results, such as a low on-the-job accident index.

345. On November 8, 2011, Petrobras posted on Facts and Data the following:

Petrobras clarifies that there has not been an overbilling,
overpricing, or any other irregularity in its works. . . . A refinery is
an enterprise of great complexity and with its own specificities.
Such works present a series of practical differences, such as
logistics, the qualification of labor, geographic localization,
contract guarantees, among other things.

346. On August 5, 2012, in response to an article issued by the Brazilian publication *O*

*Estado de S. Paulo* reporting that TCU had identified irregularities with respect to

approximately $500 million in contracts related to Abreu, Petrobras stated on Facts and Data

that it "does not recognize any of the signs of irregularities identified by the Court (TCU). . . .

These so-called irregularities found by the Court (TCU) are based mainly in methodological

differences between the Court and Petrobras regarding the analysis of the costs of the works."

The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and

that "its estimates are developed by observation of the prices on the market."

347. On December 29, 2012, Petrobras posted to Facts and Data that:

[Petrobras] denies any practice of corruption and utilizes rigorous
management instruments to guarantee the protection of its
shareholders' interests. . . . Petrobras has its accounts analyzed in
a permanent and continuous manner by internal and external
auditors under the auspices of the Comptroller General of the
Union (CGU) and the Court of Accounts of the Union (TCU). The

116

Company complies with the requirements of such agencies as the Securities Values Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbanes-Oxley Act, having had all its balances audited and approved in all instances. In 2012, for the 12th consecutive year, Petrobras was honored with the Transparency Trophy awarded by [Brazilian finance and accounting associations].

348.   On January 7, 2013, in response to questions concerning potential overpricing, Petrobras stated on Facts and Data:

Petrobras reaffirms that there are no irregularities in the construction of the Abreu e Lima Refinery in Pernambuco.  The reporting in *Fantastico* improperly compares the values of the basic refinery project, prepared seven years ago, with what is being constructed.  The initial project underwent various modifications due to of changes in the scenario.  The Company also reaffirms that there are no irregularities in the Rio de Janeiro Petrochemical Complex works.  Petrobras has clarified all questions put forth by the [TCU] and reaffirms that as of this point in time no definitive judgment has noted any irregularity whatsoever.

349.   On May 19, 2014, Petrobras made the following statement on its Facts and Data website concerning the Abreu refinery: "Petrobras restates that there is no 'overcharging of R$69.9 million' in the contract with the consortium Abreu e Lima.  Since 2008, the company has been telling the TCU that there are methodological divergences in accounting for items that are specific to the oil industry.  The court itself has revised the values, after the clarification, for R$19 million.  The company is still communicating with the TCU to demonstrate that there is no overpricing or overbilling in the works."  The Company issued virtually identical statements on Facts and Data again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23, 2014, and July 14, 2014.

350.   On July 23, 2014, Petrobras stated on the Facts and Data blog: "Regarding the matter 'TCU points to irregularities,' Petrobras reaffirms that there is no overbilling in its works."  Petrobras went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras

117

reaffirms that there is no overbilling or overpricing."

351.    Each of the statements made on the Facts and Data blog listed above were materially false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu, Comperj, and other projects were subject to overbilling and overpricing as a result of payments to third parties and a defective bidding process.

**D.    Defendants Made Materially False and Misleading Statements Concerning Compliance With By-Laws**

352.    During the Relevant Period, Petrobras included on its website the By-Laws by which it purported to govern itself.  Article 3 sets the Company's corporate purpose as "the research, mining, refining, processing, trade and transport of oil from wells, shale and other rocks, its derivatives, natural gas and other fluid hydrocarbons, in addition to other energy related activities."  Paragraph 1 of Article 3 explicitly prohibits the Company from engaging in activities related to this purpose in any manner other than those dictated by free and fair market conditions:

> Economic activities related to the corporate object shall be developed by the Corporation on a free competition basis with other companies according to market conditions, due consideration given to further principles and guidelines of Law n° 9,478 of 6 August 1997 and of Law n° 10,438 of 26 April 2002.

353.    Such statements were false because Defendants in fact engaged in a defective bidding process inconsistent with its By-Laws.

## COUNT V
### For Violation of Section 11 of the Securities Act
### Against All Defendants

354.    Plaintiffs repeat and reallege each and every allegation contained in Sections II through V and XIV above as if fully set forth herein.  This Count is alleged against all Defendants.  This Count is based on negligence and strict liability and does not sound in fraud.

Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

355.    The Registration Statements included in the Offering Documents, including Petrobras' SEC filings incorporated by reference therein at the time of the Notes Offerings, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Registration Statements with regard to each of the Notes Offerings are identified in Sections II through V and XIV above.

356.    The Individual Defendants were executive officers and representatives of the Company responsible for the contents and dissemination of the Registration Statement, or directors of Petrobras at the time the Registration Statement became effective as to the Notes Offerings.  Each of the Individual Defendants signed the Registration Statement or documents incorporated by reference, in their capacities as officers or directors of Petrobras, and caused and participated in the issuance of the Registration Statement.  By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

357.    Plaintiffs purchased or otherwise acquired Petrobras securities sold in or traceable to the Notes Offerings and did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

358.    None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts.  Moreover, Defendants did not properly identify any of these untrue statements as forward-looking statements and did not disclose

119

information that undermined the validity of those statements.

359.    Plaintiffs have sustained damages.  The value of the securities sold pursuant or traceable to the Notes Offerings has declined substantially because of Defendants' violations of Section 11 of the Securities Act.  By reason of the foregoing, Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs.

360.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Notes being bona fide offered to the public. Consequently, this action is timely.

## COUNT VI
### For Violation of Section 12(a)(2) of the Securities Act
### Against Petrobras, PGF and PifCo

361.    Plaintiffs repeat and reallege each and every allegation contained in Sections II through V and XIV above as if fully set forth herein.  This Count is alleged against Petrobras, PGF and PifCo (the "Section 12 Defendants").  This Count is based on strict liability and does not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

362.    The Section 12 Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the Notes Offerings pursuant to the Offering Documents, and directly solicited the purchase of securities by Plaintiffs by means of the Offering Documents, motivated at least in part by the desire to serve their own financial interests.

363.    The Offering Documents contained untrue statements of material fact and failed to disclose material facts, as set forth herein.  Plaintiffs purchased notes in the Notes Offerings

on the offering dates and at the offering prices, pursuant to the materially false and misleading Offering Documents.

364.   Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when they purchased or acquired the Notes.

365.   The value of the Notes issued in connection with the Notes Offerings has declined substantially subsequent to the consummation of the Notes Offerings, and Plaintiffs have sustained damages.

366.   By reason of the foregoing, the Section 12 Defendants are liable to Plaintiffs for violations of Section 12(a)(2) of the Securities Act.

367.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Notes being bona fide offered to the public. Consequently, this action is timely.

### COUNT VII
### For Violation of Section 15 of the Securities Act
### Against the Individual Defendants

368.   Plaintiffs repeat and reallege each and every allegation contained in Sections II through V and XIV above as if fully set forth herein. This Count is alleged against the Individual Defendants. This Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

369.   This Count is asserted against the Individual Defendants for violations of Section

15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs who purchased or otherwise acquired Petrobras Securities pursuant or traceable to the Offering Documents and were damaged thereby.

370.   At all relevant times, the Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants served as an executive officer or director of Petrobras prior to and/or at the time of the Notes Offerings.

371.   The Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Petrobras' business affairs.  As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Petrobras' financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Petrobras, the Individual Defendants were able to, and did, control the contents of the Offering Documents which contained materially untrue financial information.

372.   By reason of the aforementioned conduct, each of the Individual Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of Petrobras Securities.

373.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Notes being bona fide

offered to the public. Consequently, this action is timely.

## COUNT VIII
### For Violation of Pennsylvania Securities Act § 1-501
### Against Petrobras, PGF, and PifCo

374.    Plaintiffs repeat and reallege each and every allegation contained in Sections II through V and XIV above as if fully set forth herein.  This Count is alleged against Petrobras, PGF and PifCo (collectively, the "Section 501 Defendants").  This Count is based on strict liability and does not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

375.    Each of the Section 501 Defendants either sold or offered the Petrobras Securities to Plaintiffs within the meaning of Section 1-501 of the Pennsylvania Securities Act and made a direct or indirect attempt or offer to sell or dispose of, or solicitation of an offer to purchase, Petrobras Securities or interests therein to Plaintiffs.  In so doing, the Section 501 Defendants were motivated by the desire to serve their own financial interests.

376.    The Section 501 Defendants' sale or offer to sell, within the meaning of Section 1-501 of the Pennsylvania Securities Act, was directed to Pennsylvania and received by Plaintiffs in Pennsylvania.

377.    Plaintiffs purchased the Petrobras Securities within the meaning of Section 1-501 of the Pennsylvania Securities Act.

378.    In connection with the offer or sale the Petrobras Securities to Plaintiffs, the Section 501 Defendants made untrue statements of material fact and omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, as set forth herein.

379.    The Section 501 Defendants are liable to Plaintiffs under Section 1-501 of the

Pennsylvania Securities Act for their misrepresentations and omissions.

380.    Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untrue statements of material fact or omissions of material facts when they purchased the Petrobras Securities.

381.    Plaintiffs are willing to exchange their Petrobras Securities for the amount set forth in Section 1-501 of the Pennsylvania Securities Act, and Plaintiffs are entitled to damages for Petrobras Securities no longer owned in the amount set forth under Section 1-501 of the Pennsylvania Securities Act.

382.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

B.    Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this

124

action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.


## XVI.   <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury for all issues so triable.


Dated: November 23, 2015

Respectfully submitted,

Paul G. Nofer (Pa. I.D. #52241)
Michael K. Coran (Pa. I.D. #55876)
KLEHR HARRISON HARVEY
BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
215.569.3287 (Telephone)
pnofer@klehr.com
mcoran@klehr.com

Jonathan Sherman
(motion for admission *pro hac vice*
forthcoming)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
202.237.2727 (Telephone)
jsherman@bsfllp.com

Beko Reblitz-Richardson
(motion for admission *pro hac vice*
forthcoming)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
510.874.1000 (Telephone)
brichardson@bsfllp.com

Joseph F. Kroetsch
(motion for admission *pro hac vice*
forthcoming)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
914.749.8200 (Telephone)
jkroetsch@bsfllp.com

*Attorneys for Plaintiffs*